626 A.2d 1037

James FIELDS

v.

STATE of Maryland.

No. 1432, Sept. Term, 1992.

Court of Special Appeals of Maryland.

July 2, 1993.

---

724

Ronald S. Kowitz, Baltimore, for appellant.

Annabelle L. Lisic, Asst. Atty. Gen., Baltimore (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Sandra A. O'Connor, State's Atty. for Baltimore County, Towson, on the brief), for appellee.

Submitted before MOYLAN, ALPERT and FISCHER, JJ.

MOYLAN, Judge.

What we observed a decade ago in *West v. State*, 52 Md.App. 624, 625, 451 A.2d 1228 (1982), is equally pertinent as we take up the present appeal:

> "We are here called upon to explore a secluded but exotic corner of the double jeopardy garden—prosecutorial and judicial overreaching. In life, it is seldom seen except as an imagined possibility in the most painstakingly thorough of footnotes. As a contention, however, it is in luxuriant vogue and is being resorted to promiscuously."

The appellant, James Fields, went to trial along with a codefendant before a Baltimore County jury on April 23, 1992 for armed robbery and related offenses. On the second day of trial, a mistrial was declared. When the State subsequently indicated that it was preparing for a retrial, the appellant moved to bar retrial on the ground that it would violate his Fifth Amendment right against double jeopardy. On September 8, a hearing on the double jeopardy bar was conducted by Judge J. William Hinkel. Judge Hinkel denied the motion and this appeal has followed.

### What Kind of Double Jeopardy Are We Talking About?

When dealing with a generic category or *portmanteau* phenomenon such as double jeopardy, it is indispensable at the outset to identify the particular species of double jeopardy being invoked. There are no less than four such species within the genus "double jeopardy." Each carries with it a different history; each serves a different purpose; each has different implementing rules. The broad umbrella term we call "double jeopardy" today embraces (in its federal manifestation) four distinct species: 1) classic former jeopardy, arising out of the common law pleas at bar of *autrefois convict* and *autrefois acquit;* 2) simultaneous jeopardy, involving largely issues of merger and multiple punishment and lying on the at-times blurred boundary between constitutional law and statutory construction; 3) the problem of retrial following mistrial; and 4) collateral estoppel.

The species of double jeopardy law that we must examine in this case is that of "retrial following mistrial." This species was brought into the double jeopardy fold late in the day in an essentially haphazard way. In a scholarly dissenting opinion in *Crist v. Bretz*, 437 U.S. 28, 40–53, 98 S.Ct. 2156, 57 L.Ed.2d 24, 34–42 (1978), Justice Powell traced perceptively the history of what had once been "a separate rule of English practice," 437 U.S. at 41, 98 S.Ct. at 2164, through its "rather unreflective incorporation . . . into the guarantee against double jeopardy." 437 U.S. at 46, 98 S.Ct. at 2166. Justice Powell attributed this aspect of English practice to Lord Coke and demonstrated that "this rule arose as an aspect of jury practice, rather than as an element of the guarantee against double jeopardy." 437 U.S. at 41, 98 S.Ct. at 2164. He cited the leading English cases and reported that they had "refused to import the rule into the realm of pleas in bar, and it was the latter which informed the framing of the Double Jeopardy Clause." 437 U.S. at 43, 98 S.Ct. at 2165. Justice Powell also pointed out how the seminal decision of *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824), wherein the Supreme Court first employed Lord Coke's rule of English practice, did not remotely suggest that the procedural protection was based upon any double jeopardy consideration. He characterized "*Perez* as [an] independent rule barring needless discharges." *Crist*, 437 U.S. at 44, 98 S.Ct. at 2165.

In searching for the source of the uncritical doctrinal leap, Justice Powell showed how some American state courts during the 19th century placed Lord Coke's rule "under the rubric of the Double Jeopardy Clause" but that they did so "with no apparent awareness of the novelty of their action." *Crist*, 437 U.S. at 46, 98 S.Ct. at 2166. After tracing this "unreflective incorporation of a common-law rule of jury practice into the guarantee against double jeopardy" in the state courts, *id.*, Justice Powell pinpointed 1949 as the moment the Supreme Court fell into the same unthinking error:

"It was after more than a century of development in state courts that the 'defendant's valued right to have his trial

completed by a particular tribunal' appeared in the decisions of this Court for the first time, also without analysis, as an element of the Double Jeopardy Clause. *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949). *Crist,* 437 U.S. at 47, 98 S.Ct. at 2166–67. Justice Powell observed that the Supreme Court did this "almost without articulated thought." *Id.*

For better or for worse, it is done. "The moving finger writes and, having writ, moves on." However shadowy its constitutional pedigree may be, Lord Coke's rule dealing with retrials following mistrials is now inextricably ensconced in the federal family of protections known generically as "double jeopardy." It will nonetheless be prudent not to intone too readily generalized pronouncements about double jeopardy law but to remember carefully that many of the incidents of this discrete branch of it are unique to this species alone.

One characteristic of this erstwhile English rule of practice that is unique to it is its nondependence upon the rendering of a verdict. What this once meant was that the rule of practice was indifferent to the attachment of jeopardy. The English rule barring certain retrials following certain declarations of mistrial was not contingent upon any finding of earlier jeopardy. Indeed, the event that might foreclose a retrial occurred, of necessity, before there had been any jeopardy. At the common law, there was no jeopardy until a verdict was rendered. Mistrials, on the other hand, are declared before verdicts are rendered. Because the English rule of practice was not deemed to be a part of double jeopardy law, it was indifferent to whether there had or had not been any attachment of jeopardy.

In classic double jeopardy law, by contrast, the triggering event of jeopardy occurred only as a verdict was rendered. Only then had the historic event taken place which could support a plea of *autrefois acquit* or *autrefois convict.* The plea in bar to a second or subsequent jeopardy was, by definition, contingent upon the happening of the earlier jeopardy, to wit, the rendering of the earlier verdict.

In what is now the second species of double jeopardy law, that prohibiting multiple punishment for the same offense in the context of simultaneous jeopardies, the danger of multiple punishment does not arise, even potentially, until the rendering of the verdicts and does not arise, actually, until the imposition of sentence. There is no possibility of merging convictions for lesser included offenses into convictions for greater included offenses until verdicts of conviction have been rendered.

In the case of the fourth species of double jeopardy law, collateral estoppel, the very issue of estoppel cannot arise until there has been a verdict on the ultimate merits necessarily litigating a particular issue of fact. That necessary finding of fact manifested by a verdict is the estopping instrumentality. Until that moment, there is no predicate for collateral estoppel.

 In English common law, it was always the case that initial jeopardy was not deemed to attach until a verdict was rendered. That is still the position of the common law, both in England and in Maryland, today. *Queen v. Charlesworth,* 1 B. & S. 460, 500, 121 ER 786, 801 (QB 1861); *Winsor v. Queen,* LR 1 QB 289, 390 (1866); *Hoffman v. State,* 20 Md. 425, 433–434 (1863); *State v. Shields,* 49 Md. 301, 303–304 (1878); *Gilpin v. State,* 142 Md. 464, 121 A. 354 (1923). Traditionally, the rendering of a verdict and the attachment of jeopardy were simultaneous and indivisible effects of a single cause. All other varieties of what has now become the all-embracing genus of double jeopardy law are, as they always have been, verdict-dependent and jeopardy-dependent. Lord Coke's rule regulating retrials after mistrials, on the other hand, was in its pristine form, and even until quite recently, blithely independent of and indifferent to the very notion of the attachment of jeopardy.

It is for this reason that mistrial/retrial law, albeit now a part of the federal constitutional law of double jeopardy under the Fifth Amendment, has never been included within the coverage of the Maryland common law of double jeopardy. As

Judge Eldridge explained for the Court of Appeals in *Cornish v. State*, 272 Md. 312, 316 n. 2, 322 A.2d 880 (1974):

> "The view in this state was that, under the common law's double jeopardy prohibition, jeopardy did not attach until the rendition of a verdict and that, therefore, a retrial following the declaration of a mistrial did not give rise to a double jeopardy problem."

*See also Kyle v. State*, 6 Md.App. 159, 250 A.2d 314 (1969); *Boone v. State*, 3 Md.App. 11, 23–25, 237 A.2d 787 (1968). *And see West v. State*, 52 Md.App. 624, 627, 451 A.2d 1228 (1982).

When, however, *Wade v. Hunter*, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974, in 1949 suddenly deemed the mistrial/retrial rule to be a part of Fifth Amendment double jeopardy law, a tectonic shift became necessary in the undergirding analysis. In order to accommodate the mistrial/retrial rule into the body of preexisting double jeopardy law, it became logically compelling to disengage the attachment of jeopardy from the rendering of a verdict and to move it back in time to the beginning of the trial. In the service of that accommodation, it is now the federal law that in a jury trial the magic moment when jeopardy begins is the very instant that the jury is sworn. *Crist v. Bretz*, 437 U.S. at 37–38, 98 S.Ct. at 2161–62. To make something seem to be jeopardy-dependent that had never historically been jeopardy-dependent, it was necessary to relocate the attachment of jeopardy. What occurred was an almost Orwellian revisionism. Under the new dispensation, everyone conveniently forgot two hundred years of history. As Justice Powell observed in his now classic *Crist v. Bretz* dissent:

> "The rule that jeopardy attaches in a jury trial at the moment the jury is sworn is not mandated by the Constitution. It is the product of historical accident, embodied in a Court decision without the slightest consideration of the policies it purports to serve."

437 U.S. at 40, 98 S.Ct. at 2163.

In the present case, of course, the jury had been sworn and the trial had begun. It had, indeed, progressed for two days

when the mistrial was declared. Initial jeopardy, therefore, had attached. The appeal is on track.

### *Why Bother?*

The essential dissimilarity between the mistrial/retrial species of double jeopardy law and all other species of double jeopardy law is once again illustrated when it comes to consideration of the purpose intended to be served by the particular protection under review. *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076–77, 23 L.Ed.2d 656, 664–665 (1969), has become the standard statement of the multiple purposes served by the Double Jeopardy Clause:

> "That guarantee has been said to consist of three separate constitutional protections. It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." (footnotes omitted).

That, of course, is a beautiful statement of the purposes served by the former jeopardy species of double jeopardy law, with respect to both its former acquittal subdivision and its former conviction subdivision. The third of *North Carolina v. Pearce* 's stated purposes also well expresses the end served, both in a sequential jeopardy setting and a simultaneous jeopardy setting, when we carefully parse the elements of two or more nonidentical offenses, after conviction and before sentencing, to make certain that we do not subject a convicted defendant to multiple punishments for the "same offense."

That statement of purposes from *North Carolina v. Pearce,* and its regular reincantation in the years since, however, does not have anything remotely to do with the very different purpose served by the mistrial/retrial species of double jeopardy law. For that matter, it has nothing to do with the yet different purpose served by the collateral estoppel species of double jeopardy law, but in that instance, of course, there is the ready explanation that collateral estoppel was never even considered to be part of double jeopardy law until *Ashe v.*

*Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), suddenly declared it to be so a full year after the *North Carolina v. Pearce* opinion had been promulgated.

■ The purpose of the mistrial/retrial species of double jeopardy law is certainly not to preserve the finality of an acquittal or a conviction because there is no acquittal or conviction to be afforded finality. Nor is it the purpose of this species of the law to avoid multiple punishment for it applies with full vigor to the trial of a single count of a single indictment. The full flowering of the purpose of this rule of English practice was a reaction to the excesses of prosecution-minded Royalist judges, such as the legendary "Bloody Jeffreys," during the period of the "Bloody Assizes," as the Crown relentlessly pursued the rebels involved in the ill-fated Duke of Monmouth's Rebellion. The particular excess to be guarded against was the tendency of the Crown, acting either through the prosecutor or the judge or both, to sabotage a trial that was going badly for the Crown so the prosecution could regroup and live to fight another day. In *Arizona v. Washington,* 434 U.S. 497, 507–508, 98 S.Ct. 824, 831, 54 L.Ed.2d 717, 729 (1978), Justice Stevens referred to this historic abuse:

> "Although there was a time when English judges served the Stuart Monarchs by exercising a power to discharge a jury whenever it appeared that the Crown's evidence would be insufficient to convict, the prohibition against double jeopardy as it evolved in this country was plainly intended to condemn this 'abhorrent' practice." (footnotes omitted).

*See also Queen v. Charlesworth,* 121 E.R. 786, 802 (Q.B. 1861); Friedland, *Double Jeopardy* 13--14, 21–25 (1969); Sigler, *Double Jeopardy* 87 (1969).

The rule governing retrials after mistrials was the Common Law's response to what Holmes would have called "the felt necessity of the time." The Supreme Court of North Carolina discussed the historic problem and the response in *State v. Garrigues,* 2 N.C. 188, 189 (1795):

"[I]n the reigns of the latter sovereigns of the Stuart family, a different rule prevailed, that a jury in such case might be discharged for the purpose of having better evidence against him at a future day; and this power was exercised for the benefit of the crown only; but it is a doctrine so abhorrent to every principle of safety and security that it ought not to receive the least countenance in the courts of this country. In the time of James II, and since the Revolution, this doctrine came under examination, and the rule as laid down by my Lord Coke was revived...."

*Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949), characterized this guarantee as "a defendant's valued right to have his trial completed by a particular tribunal." *See also Downum v. United States,* 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100, 102 (1963); *Oregon v. Kennedy,* 456 U.S. 667, 671–672, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416, 422 (1982). *Illinois v. Somerville,* 410 U.S. 458, 463, 93 S.Ct. 1066, 1070, 35 L.Ed.2d 425, 430 (1973), spoke of the "interests of the public in seeing that a criminal prosecution proceed to verdict, either of acquittal or conviction." *United States v. Jorn,* 400 U.S. 470, 484–485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543, 556 (1971), examined more fully this particular right to keep a tribunal, once empaneled, together to the sweet or bitter end:

"[T]he crucial difference between reprosecution after appeal by the defendant and reprosecution after a *sua sponte* judicial mistrial declaration is that in the first situation the defendant has not been deprived of his option to go to the first jury and, perhaps, end the dispute then and there with an acquittal. On the other hand, where the judge, acting without the defendant's consent, aborts the proceeding, the defendant has been deprived of his 'valued right to have his trial completed by a particular tribunal.'

If that right to go to a particular tribunal is valued, it is because, independent of the threat of bad-faith conduct by judge or prosecutor, the defendant has a significant interest in the decision whether or not to take the case from the jury when circumstances occur which might be thought to war-

rant a declaration of mistrial." (footnote and citation omitted).

An understanding of that historic purpose of this English rule of practice that has since been elevated to a species of double jeopardy law is indispensable to an understanding of the notion of "prosecutorial or judicial overreaching" yet to be considered. The interest of the appellant in this case that was arguably compromised was his entitlement to keep his jury, once it had been empaneled, together until it reached a verdict. This was the particular constitutional right that was arguably violated by the declaration of a mistrial.

## Who Asked for the Mistrial?

Any inquiry into the propriety of a declaration of mistrial begins with the question, "Who asked for it?" The entire framework of subsequent analysis depends on the answer to that question. Once again, this inquiry is unique to the mistrial/retrial species of double jeopardy law. In every other branch of double jeopardy law, it is the happening of an event—the rendering of a verdict—that automatically terminates (or suspends) the initial jeopardy. It is in the mistrial/retrial enclave alone that we are concerned with which of three key trial participants sought and ultimately obtained the mistrial.

There are three key players involved in every trial: the judge, the prosecutor, and the defendant (directly or through his agent, the defense attorney). In terms of the Machiavellian employment of the mistrial device deliberately to sabotage a trial perceived to be going badly for the prosecution, the historic culprits were the judge and the prosecuting attorney. When, therefore, a mistrial is declared, over the objection of the defense, either at the request of the prosecutor or *sua sponte* by the judge, the rule provides that no retrial will be permitted unless there was a "manifest necessity" for the mistrial. When that is the posture of the mistrial analysis, a substantial body of law is available exploring every nuance of what is and what is not "manifest necessity."

*United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824); *Wade v. Hunter*, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949); *Gori v. United States*, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961); *Downum v. United States*, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963); *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); *Illinois v. Somerville*, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973); *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976); *Arizona v. Washington*, 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). In stressing yet again the unique status of this species of double jeopardy law, the inquiry into the presence of manifest necessity appears only in this context. It has no meaning in any other branch of double jeopardy law.

The present case, however, is not in that posture. Manifest necessity is, therefore, an immaterial consideration. The mistrial was certainly not requested by the assistant state's attorney. Although it appeared initially that it was going to be declared by the judge *sua sponte,* it ultimately turned out to be something that was requested by the appellant. Indeed, all three of the key players in the trial agreed that the mistrial should be declared.

As we will explore more fully when we turn to the issue of judicial or prosecutorial overreaching (a possible exemption for a defendant from the otherwise foreclosing effect of having agreed to a mistrial), a regrettable disagreement between the judge and the prosecutor steadily escalated into an angry argument and ultimately degenerated into a veritable shouting match of mutual insults and displays of uncontrolled temper. The culminating exchange was:

"The Court: I am declaring a mistrial.

[The prosecutor]: No one is asking for a mistrial. You must make a finding of manifest [necessity].

The Court: I will do what I want to do! That is what you do not understand. Take a break."

The judge, the assistant state's attorney, and counsel for both codefendants went immediately into chambers. No rec-

ord was made of what there occurred. It appears likely that the judge and the prosecutor were chagrined and embarrassed at their outbursts and that both defense counsel were in a state of mild shock. When, a few minutes thereafter, everyone emerged from chambers and went back on the record, the mood was calm and decorous:

"The Court: Counsel, do you have a motion?

Mr. Kowitz: On behalf of Mr. Fields, we are making a motion for a mistrial at this time based on the incident that occurred prior to the break that was heard within earshot of the jury. I believe that it would be unfair to continue this trial at this time considering the nature of the discussion between the Court and the prosecuting attorney. I believe that the case under those circumstances should not continue. For that reason, I would make a motion for a mistrial.

Mr. Sutley: I would like to make a motion for the same reasons on behalf of Mr. Newsome.

The Court: State?

[The prosecutor]: The State believes there is sufficient basis for a mistrial, Your Honor.

The Court: Okay. Mistrial is granted. The case will be set back in I guess in the normal course of assignment."

Because the mistrial was actually requested, let alone acquiesced in, by the appellant, the presence or absence of manifest necessity had no significance. Nonetheless, the court did indulge the prosecution in the following brief immateriality:

"[The prosecutor]: Your Honor, just so the record is clear, I believe there has been a holding that the Court must make a specific finding that there is manifest [necessity] on the record to justify a mistrial.

The Court: That is correct. For the record, based on the discussion at the bench that was heard between or overheard by the jury concerning the admissibility of statements of Fields and Newsome, and the subsequent incident that followed it, I feel there is a manifest [necessity], and a mistrial will be granted.

[The prosecutor]: Thank you, Your Honor.
Mr. Kowitz: Thank you."

### *The Foreclosing Effect of Waiver and the Limited Exemption Therefrom*

When, as here, a mistrial is requested, or even acquiesced in, by a defendant, the mistrial/retrial analysis is in a completely different posture. Manifest necessity is an irrelevancy. It, after all, is an amnesty from the double jeopardy sanction appealed to by prosecutors and judges *when they have requested or declared the mistrial.* In the very different procedural context where the defense requests or agrees to a mistrial, manifest necessity is not even a consideration. The Supreme Court recognized the diametric distinction between these two procedural situations in *Oregon v. Kennedy,* 456 U.S. 667, 672, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416, 417 (1982):

> "But in the case of a mistrial declared at the behest of the defendant, quite different principles come into play. Here the defendant himself has elected to terminate the proceedings against him, and the *'manifest necessity' standard has no place in the application of the Double Jeopardy Clause.*" (emphasis supplied).

*United States v. Dinitz,* 424 U.S. 600, 607, 96 S.Ct. 1075, 1079, 47 L.Ed.2d 267, 273 (1976), observed: "Different considerations obtain, however, when the mistrial has been declared at the defendant's request." (footnote omitted).

*Dinitz* went on to note, at 424 U.S. at 608, 96 S.Ct. at 1080:

> "The distinction between mistrials declared by the court *sua sponte* and mistrials granted at the defendant's request or with his consent is wholly consistent with the protections of the Double Jeopardy Clause."

We ourselves commented on these two very different analytic perspectives in *West v. State,* 52 Md.App. 624, 630–631, 451 A.2d 1228 (1982):

> "[T]hose situations appear in two essential postures. The first is where the mistrial has been declared by the judge *sua sponte* or at the request of the State, either over the

objection of the defendant or at least without the explicit acquiescence of the defendant. In those situations, the rule is that if there was a manifest necessity for the mistrial, retrial will not be barred; but if the trial was needlessly aborted, retrial will be barred.

The other essential posture, and the one that is before us, is where the mistrial is declared at the request of the defendant. Ordinarily, a defense request for a mistrial is treated as a waiver of any double jeopardy claim." (citations omitted).

■ Where the mistrial has actually been requested or agreed to by the defense, the pivotal issue becomes one of waiver. As was noted by *Lee v. United States,* 432 U.S. 23, 32–33, 97 S.Ct. 2141, 2146–47, 53 L.Ed.2d 80, 89 (1977):

"Where the defendant, by requesting a mistrial, exercised his choice in favor of terminating the trial, the Double Jeopardy Clause generally would not stand in the way of reprosecution."

As a limited exemption from the otherwise foreclosing effect of waiver, there appeared in 1964 a tender shoot of *dicta.* In *United States v. Tateo,* 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964), it was held that the judicial impropriety that led to a reversal in that case would not bar a retrial. The appellate reversal was analogized to a declaration of mistrial and, in a footnote, a single sentence of *dictum* added a modification to the analogy:

"If there were any intimation in a case that prosecutorial or judicial impropriety justifying a mistrial resulted from a fear that the jury was likely to acquit the accused, different considerations would, of course, obtain."

377 U.S. at 468 n. 3, 84 S.Ct. at 1590 n. 3. Let it be noted that even in that original *dictum,* the distinction that is drawn is one between 1) an ordinary "prosecutorial or judicial impropriety justifying a mistrial," and 2) an otherwise indistinguishable prosecutorial or judicial impropriety save for the additional and aggravating *mens rea* that the impropriety proceed "from a fear that the jury was likely to acquit the accused."

It is not the heinousness of the error or even the impact of the error on the trial fortunes of the defendant that separates the former from the latter; the single criterion is the motive behind the error.

That limitation on the otherwise foreclosing effect of waiver, still by way of *dicta*, was repeated in *United States v. Jorn*, 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543, 556 (1971):

> "Thus, where circumstances develop not attributable to prosecutorial or judicial overreaching, *a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution,* even if the defendant's motion is necessitated by prosecutorial or judicial error." (footnote omitted) (emphasis supplied).

That was, incidentally, the first use of the now talismanic phrase "prosecutorial or judicial overreaching."

*United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), was the first occasion where the Supreme Court decision actually turned on a defendant's eligibility for this immunization from the procedural ravages of waiver. The *Dinitz* case presents an interesting contrast with the one at bar. There, as here, one of the attorneys was the object of the trial judge's manifest anger. In that case, however, far more erosive to the effectiveness of the defense case, it was the defense attorney himself who was the focus of judicial disfavor. No less than four times during the course of the defendant's opening statement, defense counsel was sharply upbraided by the trial judge, twice at great length. Ultimately, the trial judge actually dismissed Dinitz's lead counsel from the case, "excluded [him] from the trial and ordered him to leave the courthouse." *Dinitz,* 424 U.S. at 603, 96 S.Ct. at 1078. When it became obvious that assistant counsel was not adequately prepared to go forward with the defense of the case, Dinitz was permitted to request and was granted a mistrial. The Supreme Court accepted, *arguendo,* the conclusion of the U.S. Court of Appeals for the Fifth Circuit that

"the trial judge overreacted in expelling [defense counsel] from the courtroom." 424 U.S. at 611, 96 S.Ct. at 1081.

The Supreme Court was not insensitive to the extremely difficult tactical dilemma in which a defendant may find himself as a result of judicial or prosecutorial error, a circumstance:

> " . . . where the defendant must determine whether or not to request or consent to a mistrial in response to judicial or prosecutorial error. . . . In such circumstances, the defendant generally does face a 'Hobson's choice' between giving up his first jury and continuing a trial tainted by prejudicial judicial or prosecutorial error." (citations omitted).

*Dinitz*, 424 U.S. at 609, 96 S.Ct. at 1080.

Notwithstanding the mutually perilous alternatives of a "Hobson's choice," the double jeopardy bar is still not invoked as long as the beleaguered defendant retains "primary control" of his tactical maneuvering to combat or to counteract the perils:

> "The important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of such error." (footnote omitted).

*Id.* For double jeopardy purposes, there is only deemed to be an interference with a defendant's right to keep his tribunal together when the prosecutor or judge not simply commits error but does so for the deliberate purpose of sabotaging a trial by provoking or goading the defendant into requesting a mistrial:

> "The Double Jeopardy Clause does protect a defendant against *governmental actions intended to provoke mistrial requests* and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions. It bars retrials where 'bad-faith conduct by judge or prosecutor,' threatens the '[h]arassment of an accused by successive prosecutions or declaration of a mistrial *so as to afford the prosecution a more favorable opportunity to convict*' the defendant." (citation omitted) (emphasis supplied).

*Id.* at 611, 96 S.Ct. at 1081. The critical inquiry is not into what the judge or prosecutor did but into ***why*** they did it.

In the *Dinitz* case itself, notwithstanding the untenable position in which the defendant found himself by virtue of the judge's error, the Supreme Court held that there was no bar to a retrial. The Supreme Court reasoned that the judge, albeit in error, was not motivated by bad faith:

> "[T]he trial judge's banishment of [defense counsel] from the proceedings was *not done in bad faith in order to goad the respondent into requesting a mistrial....* Even accepting the appellate court's conclusion that the trial judge overreacted in expelling [defense counsel] from the courtroom, ... the court did not suggest, the respondent has not contended, and the record does not show that the judge's action was motivated by bad faith or undertaken to harass or prejudice the respondent." (citation and footnote omitted) (emphasis supplied).

*Id.* at 611, 96 S.Ct. at 1081.

A *dictum* in *Lee v. United States*, 432 U.S. 23, 33, 97 S.Ct. 2141, 2147, 53 L.Ed.2d 80, 89 (1977), picked up the refrain from *Dinitz:* "Only if the underlying error was 'motivated by bad faith or undertaken to harass or prejudice,' would there be any barrier to retrial." A repetitive echo, again in *dicta,* was heard in *United States v. DiFrancesco*, 449 U.S. 117, 130, 101 S.Ct. 426, 434, 66 L.Ed.2d 328 (1980), "[R]eprosecution of a defendant who has successfully moved for a mistrial is not barred, so long as the Government did not deliberately seek to provoke the mistrial request."

Whereas in *United States v. Dinitz* the defendant was placed in an untenable position by judicial error, in *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), the defendant was placed in an equally untenable position by prosecutorial error. In neither case, however, did the prejudicial error constitute "overreaching" because the motivation for the error was not to goad the defendant into requesting a mistrial. In *Oregon v. Kennedy*, the explanation for the prosecutor's error was his frustration with adverse rulings by

the trial judge. The defendant, Kennedy, was an oriental rug dealer. The defense had sought to show the bias of an expert witness by bringing out that the witness had filed a criminal complaint against Kennedy. The prosecution, on redirect, was seeking to elicit the reasons why the witness had filed the complaint. The trial judge sustained a series of objections to this line of inquiry. The Oregon Court of Appeals later observed that "the judge's rulings were probably wrong." *State v. Kennedy,* 49 Or.App. 415, 619 P.2d 948, 949 (1980). Right or wrong, they frustrated the prosecutor enough to produce the following brief exchange:

"Prosecutor: Have you ever done business with the Kennedys?

Witness: No, I have not.

Prosecutor: Is that because he is a crook?"

The trial judge immediately granted Kennedy's motion for a mistrial. Kennedy later claimed that a retrial should be barred because of prosecutorial "overreaching." On appeal, the Oregon Court of Appeals agreed with Kennedy that prosecutorial "overreaching" barred a retrial. The Supreme Court of the United States reversed.

The Supreme Court began its analysis by noting that "even where the defendant moves for a mistrial, there is a narrow exception to the rule that the Double Jeopardy Clause is no bar to retrial." *Kennedy,* 456 U.S. at 673, 102 S.Ct. at 2088. Acknowledging that its earlier cases had left some doubt as to the contours of the exception, the Supreme Court felt that it was behooved "to delineate the bounds of that exception more fully than we have in previous cases." *Id.* The Court acknowledged that its discussions had not always meticulously cabined the concept of overreaching:

"The language just quoted would seem to broaden the test from one of *intent* to provoke a motion for a mistrial to a more generalized standard of 'bad faith conduct' or 'harassment' on the part of the judge or prosecutor. It was upon this language that the Oregon Court of Appeals apparently relied in concluding that the prosecutor's colloquy with

the expert witness in this case amount to 'overreaching.'"
(emphasis in original).

*Kennedy,* 456 U.S. at 674, 102 S.Ct. at 2088.

The Supreme Court then made it clear that the exclusive focus was not on the fact of prosecutorial (or judicial) error or on the impact of such error upon a defendant but only on the intent of the prosecutor (or judge) in committing the error:

"By contrast, a standard that examines the intent of the prosecutor, though certainly not entirely free from practical difficulties, is a manageable standard to apply. It merely calls for the court to make a finding of fact. Inferring the existence or nonexistence of intent from objective facts and circumstances is a familiar process in our criminal justice system."

*Id.* at 675, 102 S.Ct. at 2089.

The binding constitutional law as to the intent or motive that must be found before a prosecutorial or judicial error can be deemed "overreaching" is now emphatically clear:

"Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause. A defendant's motion for a mistrial constitutes 'a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact.' Where prosecutorial error even of a degree sufficient to warrant a mistrial has occurred, '[t]he important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of such error.' Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." (citations omitted).

*Id.* at 675–676, 102 S.Ct. at 2089–90.

The holding of *Oregon v. Kennedy* was indisputably free of any shred of ambiguity or doubt:

"[W]e do hold that the circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial."

*Id.* at 679, 102 S.Ct. at 2091.

Maryland, indeed, had fully anticipated the *Oregon v. Kennedy* ruling in *Tabbs v. State,* 43 Md.App. 20, 403 A.2d 796 (1979). *See also Bell v. State,* 41 Md.App. 89, 395 A.2d 1200 (1979); *Bell v. State,* 286 Md. 193, 406 A.2d 909 (1979); *Jones v. State,* 44 Md.App. 417, 409 A.2d 725 (1979); *Jones v. State,* 288 Md. 618, 420 A.2d 1241 (1980); *Lee v. State,* 47 Md.App. 367, 423 A.2d 267 (1980).

In *West v. State,* 52 Md.App. 624, 634–635, 451 A.2d 1228 (1982), we analyzed in significant depth the specific prosecutorial (or judicial) intent that would qualify as "overreaching" within the contemplation of *Oregon v. Kennedy:*

"What is encompassed by intentional misconduct, therefore, is not the mere general intent to do the act but, additionally, the special intent to attain some specific end thereby. There are a number of special intents that might attend the same general intent:

*General Intent:*

To do the trial act that turns out to be error:

*Special Intents:*

1. thinking it to be correct;

2. not thinking about whether it is error or not (perhaps lawyerly negligence);

3. being cavalierly indifferent to error under circumstances where one would reasonably be expected to know that there is probably error (perhaps gross negligence);

4. knowing it to be error, but hoping to get away with it, thereby clinching a probable winner (deliberate 'overkill' in a case the prosecutor has no desire to abort);

5. knowing it to be error, but desiring to 'sabotage' a probable loser either 1) by snatching an unexpected victory from probable defeat if not caught, or 2) by getting caught, thereby provoking the mistrial, averting the probable acquittal and living to fight again another day. (A calculated sabotaging of a perceived 'lost cause' in either event; an indifference to whether he is caught or not).

It is only the fifth of these special intents that will qualify under *Oregon v. Kennedy* to bar a retrial."

■ To recognize this distinction as to motive is not to countenance for a moment the other varieties of prosecutorial misfeasance. Special intents two, three and four are increasingly reprehensible and, barring a finding of harmless error, will be sternly redressed. The redress, however, is the declaration of the mistrial itself or the appellate reversal of the conviction. Many of the prosecutorial errors that trigger mistrials and reversals consist of grossly negligent and even deliberate conduct. The law has never looked upon the declaration of a mistrial and the appellate reversal as mild slaps upon the wrist, but has treated them as rigorous means for redressing even grossly negligent and deliberate misconduct.

For weighty considerations that need not here by reiterated, our constitutional law has always permitted a retrial following such mistrial or reversal, *United States v. Ball,* 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896); *United States v. Tateo, supra,* save in the limited instance where the reversal is based upon the legal insufficiency of the evidence. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) and *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978). When the prosecution suffers a mistrial or an appellate reversal, it is considered to have suffered a stern rebuke in terms of lost days, lost dollars, lost resources of many varieties and the lost opportunity to make the conviction stick. It is only in the Machiavellian situation where the prosecutor deliberately courts a mistrial that the normal sanctions are self-evidently inadequate. A scheming prosecutor cannot be rewarded by being handed the very thing toward

which he connived. For all other error, it is certainly not a condonation of misconduct simply to determine that, among the arsenal of sanctions, the sanction for such misconduct is a sanction other than the double jeopardy bar.

A defendant might well ask what difference it makes to him why the error was committed, since he suffers all the same. The answer is that, from the parochial viewpoint of the defendant, it may make very little difference; but the defendant is not the only factor in the equation. Even from the vantage point of the defendant, moreover, there are several valuable but quite distinct interests at stake. The foremost is the interest in receiving a fair trial. It is directly to protect this interest that we make available the sanctions of mistrial and reversal. They have always been adequate as sanctions to protect the fairness of a trial. The double jeopardy bar is completely extrinsic to this concern.

The second interest is in keeping together a tribunal, once it is impaneled, until a verdict has been reached. This is the unique interest that is protected by the mistrial/retrial law. The two interests are, of course, related; but they are not identical. Even after error has been injected into a case, a defendant may prefer not to abort the trial, but to wait and see whether he may not achieve an acquittal even in the teeth of prejudicial error. An appeal is still available if the gamble fails. The defendant still maintains control. A skillful, counterpunching defense tactician may, moreover, turn flagrant prosecutorial misconduct to his advantage and wrest from an outraged jury an acquittal precisely because of that misconduct. There is a significant defense interest in keeping the trial upon the tracks quite apart from the interest in receiving a fair trial.

The difference in interests and the resultant difference in the ways our constitutional law guards these interests is admittedly an elusive concept; it is, however, one that bench and bar must master to forestall needless and endless litigation in this profligately overused corner of the field. There remain, of course, other lesser forms of prosecutorial miscon-

duct: (1) the innocent mistake, (2) the mistake attributable to mere negligence and (3) the mistake attributable to gross negligence. Even at the extreme end of the reprehensibility spectrum, however, where the prosecutor has committed the deliberate foul, there is still this pivotal distinction between (1) seeking to win the game unfairly and (2), knowing the game is going awry, deliberately causing it to be cancelled and rescheduled. If the prosecutor wins the game unfairly, we make him replay it. When the prosecutor deliberately causes the game to be cancelled unfairly, we do not permit him to reschedule it.

This is what "prosecutorial or judicial overreaching" means. It is the deliberate commission of error for the specific purpose of sabotaging a trial that is going badly for the State so that the State may have another opportunity to do better. It interferes with a defendant's right to keep his tribunal, once empaneled, together to the sweet or bitter end by goading him or provoking him into asking for the declaration of mistrial in the expectation that his agreement to the mistrial will then estop any future double jeopardy claim.

It is finally to be noted that this entire issue of prosecutorial or judicial overreaching is, once again, a consideration that is unique to the mistrial/retrial species of double jeopardy law.

### Was There Prosecutorial Overreaching in this Case?

Responsibility for the angry and unpleasant exchange that was the basis for the mistrial in this case could be laid at the feet of the prosecutor. It could be laid at the feet of the trial judge. In all likelihood, as is frequently true when tempers get out of hand, it was the shared responsibility of both. In making his double jeopardy claim, however, the appellant has made no charge that he was goaded into requesting the mistrial because of judicial overreaching. His contention is based exclusively on what he claims was prosecutorial overreaching. For that reason, we shall confine our own analysis exclusively to the conduct of the assistant state's attorney and the apparent motivation for such conduct.

■ The appellant gets off on the wrong foot when he frames his complaint as one charging that "the prosecutor intentionally goaded the trial court into *sua sponte* ordering a mistrial." Intentional goading, of course, is only a factor when we are looking at the effect of the conduct of one or both of the other players on a defendant. It is not a factor when we are looking at a *sua sponte* declaration of mistrial by the judge. When the judge declares a mistrial, our only concern is whether there was a manifest necessity for such mistrial.

It is not the judge who is protected from overreaching. It is not the judge who enjoys, in the first instance, the right to keep a tribunal, once empaneled to try him, together. It is not the judge, therefore, who can suffer an erosion of that right by being goaded or provoked into waiving it. Indeed, even to talk about "goading the judge" leads to an immediate *non sequitur*. The very notion of "goading" only has pertinence to a defendant as a possible exemption from what might otherwise be deemed a waiver by him. The judge, of course, cannot waive a defendant's right to raise a double jeopardy claim. In a posture where there can be no waiver, the very idea of exemption from waiver is meaningless. It is an exemption from nothing. Any talk about goading the trial court, therefore, is simply off the doctrinal board. Because we have deemed the request of the appellant for the mistrial to have been the pivotal procedural event, however, we will treat the appellant's contention as one claiming that prosecutorial overreaching goaded the appellant into requesting the mistrial.

■ In terms of prosecutorial overreaching itself, the appellant does not hesitate to ascribe the most sinister motives to the assistant state's attorney. It is clear, he claims, that she "plotted to force" the mistrial; that she "repeatedly disobeyed the court's rulings in order to force the resulting mistrial," and that this "level of insolence in fact demonstrates a clear and specific intention to goad a mistrial."

In actual fact, the assistant state's attorney was not nearly so sinister. Rather than possessing some Svengali-like power

to manipulate the psychological reactions of judge and appellant alike, the assistant state's attorney, like the judge, was all too human in letting her anger get the better of her.

The trial of the appellant and his codefendant, Joseph Newsome, for the armed robbery of Timothy J. Watson began on April 23, 1992. The assistant state's attorney and counsel for both defendants gave opening statements to the jury. Timothy Watson testified and identified both codefendants as his assailants. The first day of trial was uneventful.

The second day of trial, April 24, began uneventfully. Officers Mark Watkins and David Bennitt both testified routinely. It was during the testimony of the State's final witness, Officer Richard Bergen, that trouble intervened. The State wanted to introduce, through Officer Bergen, statements that had been given to the police by both the appellant and the codefendant. Objections were lodged, raising both voluntariness problems and confrontation clause problems under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Aggravating the voluntariness problem was the fact that pretrial motions to suppress had not been made or litigated. With respect to the *Bruton* problem, the proffer was made by defense counsel that the codefendant, Newsome, would take the stand but that the appellant would not. There was a tentative decision to allow Officer Bergen to testify as to the statement made by the appellant but to let inquiry with respect to the codefendant await the presentation of the defense case, when the codefendant was expected to testify. Subsequently, however, the judge changed his mind with respect to the appellant's statement, not on *Bruton* grounds but on involuntariness grounds. The assistant state's attorney was disturbed by this ruling and began to display her irritation with the court:

"[The prosecutor]: Judge, is it the Court's ruling that I am allowed to inquire with the officer about what Mr. Fields said?

The Court: That is my ruling.

[The prosecutor]: Wasn't it with regard to the statement that I could get in Mr. Fields' statement and not Mr. Newsome's written statement?

The Court: Then I changed my mind based on the fact that Fields did not sign the card and I am determining that the confession is not voluntary—

[The prosecutor]: Judge, can I have a chance to prove otherwise?

The Court: No, sustained. Let's move on to the case.

[The prosecutor]: Judge, can I have a recess?

The Court: Let's move with the case.

[The prosecutor]: Judge, I really need a recess.

The Court: Why?

[The prosecutor]: Because—

The Court: Because you do not like what I do.

[The Prosecutor]: That is not the reason. I need a recess.

The Court: Fine."

A brief recess was then taken.

Following the recess, the assistant state's attorney, unhappy with the court's ruling, began to wrangle with the judge. The nub of her argument was that the judge had apparently made a practical decision to avoid questionable rulings because of his feeling that the State's proof of guilt was already adequate. The assistant state's attorney, maintaining that no one could ever be sure how much evidence was adequate, adamantly insisted on putting on a case with respect to voluntariness:

"[The prosecutor]: Your Honor, before you bring the jury back in, I would ask you to excuse the officer. I would like to be heard on the record on this last matter.

The Court: No. I am done.

[The prosecutor]: I understand you are done, but I would like to be heard for the record with regard to the tactics that are being used in this case. At the time you—at the time you took the plea from these defendants, you asked both counsel were they making any motions. They at that time [gave] their statements, but we are not going to oppose

them. They are not opposing them. Based on their statements that they were not going to oppose them, I presented to the jury my expectation of this case. You have now made a unilateral decision not allowing me to put forth any evidence with regard to voluntariness.

It is my opinion, Your Honor, that you have not heard all the evidence that this officer can provide you with regarding the voluntariness of the statement.

The Court: Right.

[The prosecutor]: It is, with all due respect, the Court's position when we have a jury in the box to make a determination when the State has any evidence or not. The Court may at this point be convinced that the State has enough evidence, but there is no way for us to know if the jury has enough evidence. I have then been placed in a position of telling the jury they are going to hear certain evidence which is lawful evidence to be admitted, that they are now being denied because at a moment they are being permitted—

Mr. Kowitz: Your Honor, the jury is now coming back in. I would ask that the State's Attorney not argue in front of the jury.

[The prosecutor]: Your Honor, may we approach the bench?

The Court: Okay."

At the very outset of the ensuing bench conference, the trial judge began to show his impatience with the stubborn insistence of the assistant state's attorney not to let the matter drop:

"[The prosecutor]: Your Honor, with respect to this motion, this is a motion which is supposed to be raised prior to trial.

The Court: I understand the rules. That is not the first time I have been in a courtroom.

[The prosecutor]: I understand that. This is to prevent the exact type of situation that we have. What has happened at this point is that the State has been ambushed by the defendants' statement, that counsel was not going to contest the statements of their clients. I then present information

to the jury that they are going to hear about those statements. The defense then waits until now to raise a motion which by the rules has to be raised prior to trial. The reason it has to be raised prior to trial is to allow the State ample opportunity to have all the evidence before the Court to make a determination with regard to voluntariness. This officer has additional information with regard to voluntariness. The Court has decided that they are not going to allow the Fields statement in because it is not voluntary."

In fending off the prosecutor's doggedly tenacious argument, the judge explained that he was also excluding the statements because of the *Bruton* problem. The assistant state's attorney continued to protest. In fairness to her, it must be noted that the judge to that point had not foreclosed continuing argument:

"The Court: Also there is a *Bruton* problem.

Mr. Kowitz: That is the issue.

[The prosecutor]: Your Honor, is the Court—

The Court: It is complicated by this fact and I have decided that based on the complication of the statement concerning whether or not he voluntarily—I am not going to conduct a hearing because I was concerned about the *Bruton* problem anyway and because anybody—you can look at that. I can look at that. You can look at it and say it is not a clear-cut thing. I am going to decide based on the fact that I feel that it leans however slightly to exculpation than it is exculpatory.

[The prosecutor]: Which statement is?

The Court: They are the statements of Fields and Newsome.

[The prosecutor]: Your Honor, they are the same statements, If they both admit to being there, then there is no problem—"

At that point, the tone of the dialogue between the judge and the prosecutor began to take on *ad hominem* overtones:

"The Court: So, it puts the other guy at the scene of the crime who is not going to say he was at the scene of the crime. You do not think that is exculpatory?

[The prosecutor]: No, sir.

The Court: Of course you do not because you are the State and you look at it from one point of view.

[The prosecutor]: Your Honor, are you not allowing me the admission of the Fields statement based on *Bruton* or based on the involuntariness of the *Miranda?*

The Court: Both reasons.

[The prosecutor]: The statements admit that based on the involuntariness of the *Miranda,* we have to have a hearing to determine voluntariness."

By that juncture, the mood at the bench conference had turned decidedly nasty:

"The Court: Since I denied it on *Bruton* and reversed my position, we do not have to get to it. Are we going to argue about this all day or are we going to proceed with the trial?

[The prosecutor]: How can I based on the fact that these two—

The Court: Then why don't you get somebody else to take your place?

[The prosecutor]: Because this is my case.

The Court: Why don't you try it?

[The prosecutor]: I would if the Court would allow me. Both of these—the defendants' attorney—

The Court: Are you closing your case then?

[The prosecutor]: Okay."

The assistant state's attorney started to walk away and the judge ordered her back to the bench. The tenor of the exchange between the two at that point became openly rancorous:

"The Court: [Ms. Prosecutor], get back up here, please.

The Court: You are arrogant and obnoxious.

[The prosecutor]: That may very well be true, but I am also right, and that is what makes the difference.

The Court: How do you know who is right, because I make the damn decision?

[The prosecutor]: You are making the decisions, and I am forced to abide by them, but that does not make them right.

The Court: Deal with them your own way. I do not deal with them the way you are dealing with them. Do you understand what I am talking about?

[The prosecutor]: No, sir, I do not understand that.

The Court: I am declaring a mistrial."

At the subsequent hearing before Judge Hinkel, who had not been the trial judge, counsel for both defendants described the scene when the mistrial was initially declared as turbulent. Counsel for the appellant characterized the judge as "visibly upset and shaken" as he stood up and pulled off his robe. Counsel for the codefendant described the judge as ripping or pulling off his robe and throwing it against the wall as he declared the mistrial and walked quickly from the room. Counsel for the codefendant described the jury as looking "stunned" and reported that the court reporter "was in tears later on." Both defense counsel portrayed themselves as simply standing by in circumspect silence and keeping discreetly quiet.

Counsel for the codefendant did state quite candidly, however, "I can't say what [the assistant state's attorney] intended to do. I can only say what happened because of what she did." Counsel for the appellant, on the other hand, is not nearly so forebearing in diagnosing the prosecutorial motive. He now ascribes to the assistant state's attorney the cool and calculating scheme of having deliberately manipulated the trial judge into an explosion of temper. In initially characterizing, at the hearing before Judge Hinkel, what had caused the ultimate outburst, however, appellant's counsel was not yet so judgmental:

"We could see that [the assistant state's attorney] and [the judge] were extremely upset after this colloquy had gone on for some period of time, extremely upset."

At the hearing before Judge Hinkel, the assistant state's attorney recounted some of what occurred in the conference in chambers. She reported how the trial judge, very commendably, acknowledged that both he and the assistant state's attorney had let their emotions get out of hand. She described how the judge took the lead in apologizing for the regrettable breakdown of decorum. The assistant state's attorney went on to report how counsel for both codefendants then took the initiative in stating that there would have to be a mistrial:

"When we were in chambers, a discussion took place where the judge says, you know, I apologize, we were emotional, we need to resolve the matter. *Both counsel said,* well, you know, *it's going to have to be a mistrial.* I agreed with *them,* it was going to have to be a mistrial." (emphasis supplied).

At one point in the hearing, Judge Hinkel asked defense counsel why they had not initially objected when the judge declared a mistrial. They responded that there had not been time for them to say anything. The assistant state's attorney, however, pointed out that she had, notwithstanding the highly emotional situation, managed to place upon the record her insistence that a ruling be made on the issue of manifest necessity and how the court had responded to that. She pointed out further that in the subsequent conference in chambers, when everyone was calm, defense counsel not only did not object to the notion that a mistrial would have to be declared but actually asked for a mistrial, first in chambers and subsequently on the record in open court.

Before Judge Hinkel, the assistant state's attorney stated unequivocally that she never intended to sabotage the trial. Even getting into an angry exchange with the judge was not the object of any deliberate design on her part: "I will say it was not an intentional act on my part to get into any sort of

confrontation with [the judge]." She again denied any purposeful design: "Although the incident which occurred is regrettable, I don't think there has been any indication that it was a purposeful act or prosecutorial misconduct on my part." She indicated that her displeasure with the judge was as a result of 1) his rulings and 2) his reversal of positions:

> "It was certainly unanticipated by me that the Court would make the rulings that it did and flip flop the way it did, but that alone was not sufficient in my mind—I can't imagine that there would be a circumstance where I would purposely engage in behavior of this nature in an effort to mistrial a case."

Judge Hinkel found that there was no intention on the part of the assistant state's attorney to goad the appellant into requesting a mistrial. It goes without saying that we cannot rule that he was clearly erroneous in that regard. Indeed, such a finding was well-nigh inevitable for a number of reasons.

Even if one were to assume that the appellant had been goaded into requesting a mistrial (which was clearly not the case), the goading could hardly be laid at the feet of the prosecutor alone. The conduct in the presence of the jury that precipitated the mistrial was the loss of control by the judge, not the antecedent behavior of the prosecutor. At the very least, there was dual responsibility. At the hearing before Judge Hinkel, counsel for the codefendant unequivocally attributed a share of the fault to the trial judge: "The conduct of the prosecutor *and also of the Court* was one of the reasons that a mistrial was granted." (emphasis supplied). Codefendant's counsel went on: "The entire mistrial was caused by the actions of the prosecutor. *Maybe the judge overreacted,* I'm not sure." (emphasis supplied). Counsel concluded in that regard: "It was caused by the state's attorney and, in some [part], *and the judge,* the colloquy they had." (emphasis supplied). The goading or precipitating act was not an act performed by the prosecutor.

In the second place, the very concept of "prosecutorial overreaching" contemplates not simply the design or purpose to goad a defendant into requesting a mistrial but, more significantly, some deliberate act in pursuit of that purpose that injected error into the trial. In this case, the assistant state's attorney may not have been a model for a class in lawyerly decorum. She may have been aggressive, assertive, stubborn, abrasive, unyielding, combative, or even, as the judge characterized her, "arrogant and obnoxious." Even if that be so, it is not *ipso facto* error. Many famous trial attorneys are all of those things. Had this trial gone the distance, no action of the assistant state's attorney would have formed the basis for a finding of reversible error. Although she may have continued to argue instead of yielding gracefully, at no time did the assistant state's attorney violate any court order to sit down and say nothing more about the subject. Quite aside from the absence of any "overreaching" purpose, there was no necessary predicate action on her part.

In the third place, there was no compelling motivation for the assistant state's attorney to seek to sabotage the trial. This was not a case that was "going down the tubes" for the State. The robbery victim made an unequivocal identification in the courtroom of the appellant as one of the robbers. When the police stopped the automobile occupied by the appellant and his codefendant, it bore the tag number that had been observed at the crime scene by the victim and provided to the police. Both the appellant and his codefendant were wearing clothing similar to that described by the victim. Although victory can never be guaranteed, this was not a case that the State was likely to lose.

In the fourth place, one wonders why even open warfare between the judge and the prosecutor would cause the appellant necessarily to feel that he was thereby being prejudiced. It may have been the case that he was being richly benefitted. Open warfare between the judge and appellant's counsel, of course, would be another matter. If a trial judge, in the presence of the jury, called defense counsel "arrogant and obnoxious," the defendant would be at the appellate barri-

cades, claiming that such judicial disfavor had prejudiced the defense. The flip-side of the same logic would suggest that if the trial judge, in the presence of the jury, so characterizes the prosecutor, evidence of such judicial disfavor would prejudice the prosecution's case, enuring to the obvious *benefit* of the defendant. Many a criminal defendant, bereft of any true defense on the merits, secretly hopes for just such confusion to exploit or just such a "red herring" to distract the attention of the jury and send it down some false trail. Blatant hostility between the prosecuting attorney and the judge would seem to be something that wily defense counsel might welcome and, actively or passively, delightfully exploit. Even if defense counsel did not deem it desirable to seize such an opportunity, moreover, it could not be foreseen by the "goading" prosecutor that that would be the case. The ostensible "goad" just does not fit into a logical cause-and-effect sequence.

In the last analysis, of course, all of the circumstances and the entire context of this breakdown in decorum indisputably indicate that whatever conduct, regrettable but humanly understandable, the prosecutor and the judge engaged in toward each other was engaged in by them with no thought being given to the appellant or his case. The judge and prosecutor were for a brief moment all-consumed by irritation with and anger toward each other. As Judge Hinkel observed, "In the midst of a trial, not only do lawyers become emotionally involved, so do judges." The exasperation, frustration, and irritation mutually felt by judge and prosecutor took on a generating force of its own. The two were pulled, for a few moments, into a maelstrom of rapidly accelerating animosity that took on an energizing life of its own. The indecorous words the judge and prosecutor had with each other, and the feelings that propelled those words, would have been precisely the same if the appellant and his codefendant had not even been in the room or if the appellant and his codefendant had not even been on trial. Whatever was done, however regrettable, was not aimed at the appellant. For "overreaching" purposes, if the appellant was not the intended object of the

actions being scrutinized, any merely coincidental impact on him, even assuming some adverse impact, is immaterial.

Having considered all of the evidence and having heard all of the argument, Judge Hinkel found and ruled:

"I have to determine from what I read and what has been argued to me whether or not [the assistant state's attorney] engaged in a calculated sabotaging or whether she at some point, because of those rulings, had made a determination to deliberately conduct herself in such a way as to amount to seeking a mistrial.

If I had determined there was bad faith on the part, that is bad faith conduct on [the] part of the prosecutor or the judge, then I think that a retrial would be barred.

Reading the transcript, listening to the arguments, I do not believe [the assistant state's attorney] engaged in prosecutorial misconduct. I believe she was making an honest effort to argue her points to the Court. Unfortunately, it, something happened. I don't know what happened. But it got the two of them set off. Whose fault it was or—I just don't know. But I am persuaded that it was not something done intentionally. She was not trying to sabotage the case.

I believe there was some honest misunderstandings on both the part of the judge and [the assistant state's attorney] that, unfortunately, came within the knowledge of the jury, which I think would have prejudiced the defendants had a mistrial not been declared.

So I do not find that the conduct of the State was such as to bar a retrial. The Motion to Dismiss is denied."

We see no error.

The appellant raises an additional procedural contention that Judge Hinkel, instead of hearing the double jeopardy issue himself, should have referred the case back to the original trial judge for an evidentiary hearing on the issue of prosecutorial overreaching. The short answer to the contention is that it was not raised below and has not, therefore, been preserved for appellate review.

The State has moved to strike the record extract filed by the appellant, except for those limited parts of it that are extracted from the opinions of the lower court. For the reasons fully stated by us in *Eiland v. State*, 92 Md.App. 56, 101–103, 607 A.2d 42 (1992), *rev'd on other grounds*, 330 Md. 261, 623 A.2d 648 (1993), we grant the State's Motion to Strike the Appellant's Appendix where that Appendix goes beyond the limit authorized under Rule 8–504.

*JUDGMENT AFFIRMED;*

*COSTS TO BE PAID BY APPELLANT.*