not evidence of anything. We conclude that Morgan has not established prejudice by counsel's failure to object or to otherwise keep the evidence envelopes from being published to the jury with the word "murder" on them.

## VI. CONCLUSION

We conclude that there was no prejudicial error in the district court's giving of the step jury instruction or in its refusal to give Morgan's proposed instruction. We further conclude that two of Morgan's claims of ineffective assistance of counsel are without merit, but that the record is insufficient to review the other two claims.

AFFIRMED.

───────────────

STATE OF NEBRASKA, APPELLEE, V.
WA'IL MUHANNAD, APPELLANT.
___ N.W.2d ___

Filed September 20, 2013.   No. S-13-042.

1. **Motions for Mistrial: Pleadings: Prosecuting Attorneys: Intent: Appeal and Error.** While the denial of a plea in bar generally involves a question of law, an appellate court reviews under a clearly erroneous standard a finding concerning the presence or absence of prosecutorial intent to provoke the defendant into moving for a mistrial.
2. **Double Jeopardy.** Traditionally, the Double Jeopardy Clause has been viewed as safeguarding three interests of defendants: (1) the interest in being free from successive prosecutions, (2) the interest in the finality of judgments, and (3) the interest in having the trial completed in front of the first tribunal.
3. **Constitutional Law: Double Jeopardy.** The constitutional protection against double jeopardy does not mean that every time a defendant is put to trial before a competent tribunal, the defendant is entitled to go free if the trial fails to end in a final judgment.
4. ____: ____. Balanced against a defendant's interests in having a trial completed in front of the first tribunal is society's right to one full and fair opportunity to prove the defendant's guilt.
5. ____: ____. When society is deprived of its right to attempt to prove a defendant's guilt in a single prosecution because of a trial error, the interests of society in vindicating its laws generally outweigh the double jeopardy interests of the defendant.
6. **Double Jeopardy: Motions for Mistrial.** It is the general rule that where a court grants a mistrial upon a defendant's motion, the Double Jeopardy Clause does not bar a retrial.

7.   \_\_\_\_: \_\_\_\_. Only where the governmental conduct in question is intended to goad a defendant into moving for a mistrial may the defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on the defendant's own motion.

Appeal from the District Court for Douglas County: Gary B. Randall, Judge. Affirmed.

Alan G. Stoler, P.C., L.L.O., for appellant.

Jon Bruning, Attorney General, and Stacy M. Foust for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

McCormack, J.

## NATURE OF CASE

Appellant, Wa'il Muhannad, was charged with first degree sexual assault of his stepdaughter, M.H. During trial, M.H.'s therapist testified that the event causing M.H.'s posttraumatic stress disorder (PTSD) was Muhannad's sexually abusing her. The trial court allowed this testimony over Muhannad's objection, but later concluded that the testimony was reason to grant Muhannad's motion for a mistrial. Muhannad then filed a plea in bar, which the court denied. The issue is whether the State's questioning of the therapist was intended to goad Muhannad into moving for a mistrial, such that the State could get a second chance at a more favorable prosecution and thereby circumvent the protections of the Double Jeopardy Clauses of the U.S. and Nebraska Constitutions. We affirm the denial of the plea in bar.

## BACKGROUND

M.H.'s mother married Muhannad in 2006, when M.H. was 10 years old. M.H. lived continuously with her mother and Muhannad except for brief periods when she stayed with her biological father. In 2011, M.H. disclosed that Muhannad had been sexually abusing her. The State charged Muhannad with first degree sexual assault of a child.

## Motion in Limine

Before trial, Muhannad moved in limine to exclude the testimony of Carrie Gobel, M.H.'s psychotherapist. Muhannad argued that the prosecution intended to have Gobel testify as to whether M.H. was telling the truth. Muhannad argued that such testimony would invade the province of the jury and, furthermore, that Gobel was not qualified to opine on the subject.

The State explained it wished to call Gobel to testify about "the symptoms of children who have been sexually abused." It further intended for Gobel to testify that M.H. had PTSD. Finally, the State expected Gobel to testify that M.H. exhibited "certain symptoms of the sexual abuse." The trial court denied the motion in limine, and the case proceeded to trial.

## Trial

M.H. was 16 years old at the time of trial. M.H. stated that sometime around 2008 or 2009, Muhannad began sexually abusing her. It began with Muhannad's touching her when they were watching a movie at home. M.H. recalled that the movie was "'Reign Over Me.'"

M.H. testified that soon thereafter, Muhannad began to have intercourse with her three to four times a week. M.H. described that Muhannad would either come into her bedroom at night or have intercourse with her during times in the day when her mother was not home.

M.H. testified that Muhannad always ejaculated into a napkin. He asked her twice to take pregnancy tests, and M.H. described those tests in detail. M.H. described incidents where Muhannad made her watch pornography with him. M.H. said that sometimes Muhannad told her to use a vibrator while he watched. She also testified that Muhannad made her give him manual stimulation and oral sex. M.H. testified that Muhannad said he would kill her if she told anyone about the assaults.

In May 2011, M.H.'s mother picked M.H. up from school and told M.H. that Muhannad had given her the "final talaq." M.H.'s mother explained that the final talaq was the final act, under Islam, of divorcing one's wife. After hearing this news,

M.H. revealed the assaults to her mother. M.H.'s mother testified that M.H. was "shaking, scared, crying" when she reported the abuse. M.H. explained that she chose to finally disclose the abuse to her mother when she learned of the final talaq, "[b]ecause I had come to, like, an understanding of my mom wouldn't hurt me or she wouldn't, like, tell me that I was lying." M.H.'s mother called the police.

An Omaha police officer responded to the call. The officer interviewed the mother and M.H. and described M.H. as "very shy and talked under her breath and looked down at the ground." The officer took M.H. and her mother to a hospital.

At the hospital, a nurse conducted a forensic sexual assault examination of M.H. M.H. testified that the last sexual contact between herself and Muhannad was before school on the same day she told her mother about the abuse. There was some dispute about whether M.H. had previously reported that the last assault had been the day before.

M.H. testified that on the morning of the last alleged assault, she was taking a shower when Muhannad entered the bathroom and asked her to exit the shower. Muhannad then directed M.H. to lean up against the sink while he had intercourse with her from behind. Muhannad ejaculated into a napkin. After Muhannad left the bathroom, M.H. again showered, dressed, and went to school.

The nurse was unable to find any foreign pubic hairs during the forensic examination, and a DNA analyst confirmed that no semen or other foreign DNA was found on M.H. The nurse testified she did not expect to find semen or pubic hair, however, because of the position in which the last reported assault took place and because Muhannad had ejaculated into a napkin. Furthermore, M.H. had showered and had gone to the bathroom after the assault.

Defense counsel pointed out the lack of physical evidence supporting the allegations of abuse. Defense counsel also pointed out details of M.H.'s story that M.H. was describing for the first time at trial. Principally, these details included the instances where Muhannad asked her to use a vibrator and when he made her take pregnancy tests.

Defense counsel also noted M.H.'s delayed reporting of the abuse. Defense counsel particularly focused on when M.H. had written an affidavit listing the reasons she wanted to live with her biological father. At that time, M.H. did not disclose sexual abuse as one of those reasons.

Defense counsel suggested that M.H.'s mother conspired to get Muhannad arrested so she could marry another man who allegedly wanted to take over a business that she and Muhannad owned. That man was their business partner. Defense counsel asked M.H.'s mother if, before the sexual abuse accusations, she had "aspirations . . . of somehow creating a way that [she] could get [Muhannad] out of the picture."

Defense counsel pointed out that M.H.'s mother "married" that man—who was also her friend's husband—shortly after receiving the final talaq from Muhannad. And defense counsel implied that M.H.'s mother pressured M.H. to make allegations of sexual abuse in order to carry out this scheme to get Muhannad "out of the picture." Admittedly, M.H.'s mother had told M.H. that "it would be a shame" if Muhannad got out of jail and M.H. ended up there instead. M.H. similarly testified that her mother told her she would get in trouble if she changed her story.

But M.H.'s mother denied having any plan to get Muhannad "out of the picture" so another man could take over the business with her. In fact, she testified that the business shut down after Muhannad's arrest.

M.H. clarified that no one had ever told her to lie about the sexual abuse. M.H.'s mother explained that she had made the comment about who would be going to jail when M.H. was fearful of testifying. M.H.'s mother said she was confused about the penal consequences for refusing to testify.

Defense counsel also suggested that M.H. had fabricated the sexual assaults in order to keep Muhannad from divorcing her mother. It was undisputed that, at least at times, M.H. was opposed to Muhannad's divorcing her mother. In fact, M.H. testified that when Muhannad sent M.H.'s mother the second talaq, M.H. had threatened Muhannad that she would report the sexual assaults if he divorced her mother.

### GOBEL'S TESTIMONY

In this context, the State called Gobel as its last witness. Gobel is a licensed mental health practitioner with training in sexual abuse. Gobel was M.H.'s therapist for the 2 years leading up to trial.

Gobel testified that M.H. had been diagnosed with PTSD. She described M.H.'s symptoms, which included anxiety, hypervigilance, racing thoughts, estrangement from others, irritability, and a sense of a foreshortened future. Without objection, Gobel testified that during her sessions with M.H., M.H. would have intrusive thoughts about "the sexual abuse." Gobel further testified, without objection, that M.H. had nightmares about the abuse and that M.H. reported being more easily irritated by a sister who resembled Muhannad.

Then the prosecutor asked, "According to your assessment and your ongoing treatment with [M.H.], can you describe for me what you believe to be the traumatic event that has caused this diagnosis?" Defense counsel objected to the question as invading the province of the jury. During the sidebar that followed, the court asked, "Do you think [Gobel's] testifying that she believes that having been sexually abused is relying on the credibility? I mean, she's making an assumption. That's the basis of her diagnosis. Whether she believes it or not is not relevant." The prosecutor argued in a similar vein: "The distinction between [Gobel's] credibility is different from what — based upon the sources that she's received her information that she can ultimately indicate based upon her professional opinion that that diagnosis or the traumatic event that caused that is, in fact, the sex abuse."

The court overruled defense counsel's objection, and the prosecutor again asked Gobel, "According to your assessment of [M.H.], what was the traumatic event that initiated the diagnosis of PTSD?" Gobel answered, "[M.H.] was sexually abused by her stepfather, [Muhannad], for an extensive period of time."

Gobel went on to explain, without objection, that a child is unlikely to remember every instance of abuse in cases of prolonged periods of sexual abuse. Gobel further detailed some of

the reasons delayed disclosure is common in cases of sexual abuse of a child.

At the close of the case and before closing arguments, there was more discussion between the attorneys and the court about whether Gobel's testimony had impermissibly vouched for M.H.'s truthfulness. The court again expressed its opinion that Gobel was simply explaining what she was treating M.H. for—based upon M.H.'s reports to Gobel.

On the prosecutor's own initiative, she then sought to clarify what would be appropriate closing arguments:

> [Prosecutor]: I guess, just while we bring that up the issue, in closing argument, I think based on what you're saying, Judge — and I think I understand what you're saying — it would not be appropriate at all for us to stand up and say . . . Gobel thinks [M.H.] was sexually assaulted.
>
> [Court]: No.
>
> [Prosecutor]: It's only appropriate to say [Gobel was] treating [M.H.] for [PTSD] related to sexual abuse.
>
> [Court]: Right. Thank you. Exactly.
>
> [Prosecutor]: We'll make sure we don't say it wrong in the argument.

## Motion for Mistrial

The following day, defense counsel moved for a mistrial. The prosecutor argued against the motion. The prosecutor explained that she did not intend to solicit "an answer regarding the individual's credibility." Rather, "[i]t was a question with respect to what traumatic event the diagnosis went to." The court agreed: "I reviewed the testimony last night, and I believe that the answer was [the] basis upon which the diagnosis was formed and the information that [Gobel] had received, and not the ultimate statement of who was the perpetrator of such even[t]."

The court thus denied the motion for mistrial. It also denied defense counsel's motion for directed verdict. But, after a short recess in which the court conducted additional research, the court changed its mind. It granted Muhannad's motion for a mistrial. The court explained that while Gobel might

have been able to opine that "sexual abuse" was the cause of M.H.'s PTSD, Gobel's testimony was "over the edge" when she stated her belief that Muhannad was the perpetrator of the sexual abuse.

## Plea in Bar

The court was prepared to retry the case the following Monday, but defense counsel filed a plea in bar to the retrial. Defense counsel argued that the State had an obligation to know the law and that the law was clear the testimony the State elicited was inadmissible. Defense counsel further argued that the State was "on notice" at the time of the motion in limine that this type of questioning impermissibly infringed upon the province of the jury.

Defense counsel did not, however, argue that the State specifically intended to provoke a mistrial through such questioning. Instead, defense counsel argued that the U.S. Supreme Court in *Oregon v. Kennedy*[1] had held that the double jeopardy bar to retrial was not limited to circumstances where the State intended to provoke a mistrial.

The prosecutor disagreed with defense counsel's reading of *Oregon v. Kennedy* and argued that it had no intention to provoke a mistrial.

The court denied the plea in bar. The court rejected defense counsel's reading of *Oregon v. Kennedy*.[2] The court found that the prosecutor did not intend to goad Muhannad into moving for a mistrial. In fact, the court concluded that there appeared to be no tactical advantage for the State by forcing a mistrial.

In reaching the conclusion that the prosecutor did not intend to provoke a mistrial, the court found that the strength of the State's case was not weak and that the progression of the trial appeared to be in the State's favor. The court found that before the conduct causing the mistrial, there was no pattern of prosecutorial misconduct or escalation of any questionable conduct. Rather, the event leading to the mistrial was an isolated

---

[1] *Oregon v. Kennedy*, 456 U.S. 667, 102 S. Ct. 2083, 72 L. Ed. 2d 416 (1982).

[2] Citing *State v. Bostwick*, 222 Neb. 631, 385 N.W.2d 906 (1986).

incident. The court found that the timing of the State's conduct did not support an inference that the prosecutor intended to cause a mistrial. Finally, the court found that the prosecutor resisted the motion for mistrial.

The court concluded that the prosecutor made "an error in judgment." Muhannad now appeals the denial of the plea in bar.

## ASSIGNMENT OF ERROR

Muhannad assigns as error the trial court's determination that retrial was not barred by double jeopardy principles.

## STANDARD OF REVIEW

[1] While the denial of a plea in bar generally involves a question of law, we review under a clearly erroneous standard a finding concerning the presence or absence of prosecutorial intent to provoke the defendant into moving for a mistrial.[3]

## ANALYSIS

The parties do not dispute the propriety of the mistrial. The issue is whether concepts of double jeopardy bar a retrial and, thus, the court should have granted Muhannad's plea in bar.

[2] Traditionally, the Double Jeopardy Clause has been viewed as safeguarding three interests of defendants: (1) the interest in being free from successive prosecutions, (2) the interest in the finality of judgments, and (3) the interest in having the trial completed in front of the first tribunal.[4] This appeal involves the defendant's interest in having the trial completed in front of the first tribunal.[5]

---

[3] See, *U.S. v. Radosh*, 490 F.3d 682 (8th Cir. 2007); *Robinson v. Wade*, 686 F.2d 298 (5th Cir. 1982); *United States v. Curtis*, 683 F.2d 769 (3d Cir. 1982); *State v. Marshall*, 269 Neb. 56, 690 N.W.2d 593 (2005); *State v. Michael J.*, 274 Conn. 321, 875 A.2d 510 (2005); *State v. Thomas*, 275 Ga. 167, 562 S.E.2d 501 (2002); *People v. Campos*, 349 Ill. App. 3d 172, 812 N.E.2d 16, 285 Ill. Dec. 427 (2004); *People v Dawson*, 431 Mich. 234, 427 N.W.2d 886 (1988). See, also, *State v. Lewis*, 78 Wash. App. 739, 898 P.2d 874 (1995).

[4] *State v. Rogan*, 91 Haw. 405, 984 P.2d 1231 (1999).

[5] See, e.g., *Oregon v. Kennedy, supra* note 1; *United States v. Dinitz*, 424 U.S. 600, 96 S. Ct. 1075, 47 L. Ed. 2d 267 (1976).

[3-5] The constitutional protection against double jeopardy does not mean that every time a defendant is put to trial before a competent tribunal, the defendant is entitled to go free if the trial fails to end in a final judgment.[6] Balanced against a defendant's interests in having the trial completed in front of the first tribunal is society's right to one full and fair opportunity to prove the defendant's guilt.[7] When society is deprived of its right to attempt to prove a defendant's guilt in a single prosecution because of a trial error, the interests of society in vindicating its laws generally outweigh the double jeopardy interests of the defendant.[8]

[6] Furthermore, it is the general rule that where a court grants a mistrial upon a defendant's motion, the Double Jeopardy Clause does not bar a retrial.[9] A defendant's motion for a mistrial constitutes a deliberate election on his or her part to forgo the right to the trial completed before the first trier of fact.[10] This is true even if the defendant's motion is necessitated by prosecutorial or judicial error.[11] When the mistrial is declared at the defendant's behest, the defendant's right to have his or her trial completed by a particular tribunal is, as a general matter, subordinated to the public's interest in fair trials designed to end in just judgments.[12]

[7] In *Oregon v. Kennedy*, the U.S. Supreme Court defined a "narrow exception"[13] to this balance: "Only where the governmental conduct in question is intended to 'goad' the

---

[6] *State v. Marshall, supra* note 3.

[7] See *Arizona v. Washington*, 434 U.S. 497, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978).

[8] See *State v. Rogan, supra* note 4.

[9] *Oregon v. Kennedy, supra* note 1.

[10] *State v. Bostwick, supra* note 2; *State v. Munn*, 212 Neb. 265, 322 N.W.2d 429 (1982).

[11] *United States v. Jorn*, 400 U.S. 470, 91 S. Ct. 547, 27 L. Ed. 2d 543 (1971); *State v. Bostwick, supra* note 2.

[12] See, *Oregon v. Kennedy, supra* note 1; *Wade v. Hunter*, 336 U.S. 684, 69 S. Ct. 834, 93 L. Ed. 2d 974 (1949); *State v. Bostwick, supra* note 2.

[13] *Oregon v. Kennedy, supra* note 1, 456 U.S. at 673.

defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion."[14] The Court rejected any more generalized standard of bad faith conduct, harassment, or overreaching as an exception to the defendant's waiver of his or her right to a determination by the first tribunal.[15]

The Court explained that a standard based on the extent of prosecutorial misconduct is an untenable one. It refused to "add another classification of prosecutorial error" beyond those already established for trial error and for trial error warranting mistrial "without supplying any standard by which to assess that error."[16] The Court concluded that in contrast to a standard based on the extent of the error, a standard that examines the intent of the prosecutor, though certainly not entirely free from practical difficulties, is a manageable standard to apply.[17]

"Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on [the] defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause."[18] Only when there is intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause is the defendant's election to move for a mistrial but a "hollow shell."[19] Only then does the defendant no longer "'retain primary control over the course to be followed in the event of [the prosecutorial] error.'"[20]

The Supreme Court noted that "[e]very act on the part of a rational prosecutor during a trial is designed to 'prejudice' the

---

[14] *Id*., 456 U.S. at 676.

[15] *Oregon v. Kennedy, supra* note 1.

[16] *Id*., 456 U.S. at 675.

[17] *Oregon v. Kennedy, supra* note 1.

[18] *Id*., 456 U.S. at 675-76.

[19] *Id*., 456 U.S. at 673.

[20] *Id*., 456 U.S. at 676.

defendant by placing before the judge or jury evidence leading to a finding of his guilt."[21] Furthermore, due to the complexity of the rules of evidence, it is likely that some evidence offered by the prosecutor will be objectionable.[22] The more serious of these prosecutorial infractions will warrant a mistrial.[23] But "[t]he law has never looked upon the declaration of a mistrial . . . as [a] mild slap[] upon the wrist."[24] A mistrial is a "rigorous means for redressing even grossly negligent and deliberate misconduct."[25] When the prosecution suffers a mistrial, it suffers "a stern rebuke in terms of lost days, lost dollars, lost resources of many varieties and the lost opportunity to make the conviction stick."[26] "It is only in the Machiavellian situation where the prosecutor deliberately courts a mistrial that the normal sanctions are self-evidently inadequate. A scheming prosecutor cannot be rewarded by being handed the very thing toward which he connived."[27]

We have consistently held that the Double Jeopardy Clause of the Nebraska Constitution provides no greater protection than that of the U.S. Constitution.[28] We have accordingly declined to extend the *Oregon v. Kennedy* exception beyond situations where the prosecutor intended that the misconduct would provoke a mistrial.[29]

It is the defendant's burden to prove this intent.[30] The trial court's finding regarding whether the prosecuting attorney

---

[21] *Id.*, 456 U.S. at 674.

[22] *Oregon v. Kennedy, supra* note 1.

[23] *Id.*

[24] *Fields v. State*, 96 Md. App. 722, 744, 626 A.2d 1037, 1048 (1993).

[25] *Id.*

[26] *Id.*

[27] *Id.* at 744-45, 626 A.2d at 1048.

[28] *State v. Kula*, 254 Neb. 962, 579 N.W.2d 541 (1998).

[29] *Id.*

[30] See, e.g., *Oregon v. Kennedy, supra* note 1 (Stevens, J., concurring in the judgment; Brennan, Marshall, and Blackmun, JJ., join); *U.S. v. Perlaza*, 439 F.3d 1149 (9th Cir. 2006); *Robinson v. Com.*, 17 Va. App. 551, 439 S.E.2d 622 (1994).

intended to cause a mistrial is a finding of fact.[31] While the denial of a plea in bar generally involves a question of law,[32] most courts review for clear error the trial court's finding concerning prosecutorial intent to goad the defendant into moving for mistrial.[33] This is consistent with our standard of review for other findings of fact by the trial court, and we hereby adopt it.

A trial court makes its finding of subjective intent by "[i]nferring the existence or nonexistence of intent from objective facts and circumstances . . . ."[34] An appellate court can review similar evidence in determining whether the trial court clearly erred in its finding.

In *Oregon v. Kennedy*, the Court refused to disturb the lower court's finding that the prosecutor had not intended to provoke a mistrial by asking a witness whether he refused to do business with the defendant because the defendant was a "'crook.'"[35] It did not elaborate further on the evidence reviewed in reaching that decision. Justice Powell, however, noted in his concurring opinion three relevant circumstances that convinced him this finding was correct: (1) There was no sequence of overreaching before the single prejudicial question; (2) it was evident from a colloquy between counsel and the court that the prosecutor not only resisted, but also was surprised by the defendant's motion for a mistrial; and (3) at the hearing on the defendant's double jeopardy motion, the prosecutor testified and the trial court found as a fact that there was no intention to cause a mistrial.[36]

---

[31] *Oregon v. Kennedy, supra* note 1. See, *U.S. v. Lun*, 944 F.2d 642 (9th Cir. 1991); *Robinson v. Com., supra* note 30.

[32] See *State v. Marshall, supra* note 3.

[33] See, *U.S. v. Radosh, supra* note 3; *Robinson v. Wade, supra* note 3; *United States v. Curtis, supra* note 3; *State v. Michael J., supra* note 3; *State v. Thomas, supra* note 3; *People v. Campos, supra* note 3; *People v Dawson, supra* note 3. See, also, *State v. Lewis, supra* note 3.

[34] *Oregon v. Kennedy, supra* note 1, 456 U.S. at 675.

[35] *Id.*, 456 U.S. at 669.

[36] *Oregon v. Kennedy, supra* note 1 (Powell, J., concurring).

Some state and federal courts have accordingly set forth factors to consider when evaluating the question of an intention to goad the defendant into moving for mistrial. Certain courts have adopted the three factors articulated by Justice Powell.[37] At least one court has set forth a four-factor inquiry: (1) whether there was a sequence of overreaching or error prior to the error resulting in the mistrial; (2) whether the prosecutor resisted the motion for a mistrial; (3) whether the prosecutor testified, and the court below found, that there was no intent to cause a mistrial; and (4) the timing of the error.[38] Another court has adopted a three-factor inquiry more focused on motive: (1) whether the record contains any indication that the prosecutor believed the defendant would be acquitted, (2) whether a second trial would be desirable for the government, and (3) whether the prosecutor proffered some plausible justification for its actions.[39]

We find all of the above-listed factors appropriate for consideration. But we decline to adopt a closed list that might limit a trial court's inquiry into a prosecutor's intent or our inquiry into whether the trial court's finding of intent was clearly erroneous. In addition to any objective factors listed above or that might be relevant under the particular circumstances of a particular case, we bear in mind that the trial court is in a better position than a reviewing court to judge the motives and intentions of the prosecutor.[40]

The record here supports the trial court's conclusion that the prosecutor simply made "an error in judgment." In other words, it does not appear from the record that the prosecutor intentionally committed prosecutorial misconduct—let alone intended that her misconduct would provoke a mistrial.

---

[37] See, *U.S. v. White*, 914 F.2d 747 (6th Cir. 1990); *State v. Girts*, 121 Ohio App. 3d 539, 700 N.E.2d 395 (1997).

[38] *State v. Torres*, 328 N.J. Super. 77, 744 A.2d 699 (2000).

[39] See *United States v. Curtis, supra* note 3.

[40] *People v. Campos, supra* note 3. See, also, *U.S. v. Pavloyianis*, 996 F.2d 1467 (2d Cir. 1993); *State v. Michael J., supra* note 3.

It is not always easy to tell when an expert crosses the line into forbidden testimony on truthfulness.[41] We have only a handful of cases in Nebraska defining that line between permissible indirect bolstering of the alleged victim's credibility and impermissible direct or indirect bolstering of the alleged victim's credibility.

In *State v. Roenfeldt*,[42] we held that an expert's testimony of the symptoms, behavior, and feelings generally exhibited by children who have been sexually abused was relevant and admissible. "'[F]ew jurors," we explained, "have sufficient familiarity with child sexual abuse to understand the dynamics of a sexually abusive relationship.'"[43] Furthermore, "'the behavior exhibited by sexually abused children is often contrary to what most adults would expect.'"[44] Similar testimony was upheld by the Nebraska Court of Appeals in *State v. Bruna*.[45] In that case, the psychologist took it a step further by setting forth the factors to consider in evaluating the veracity of a child's sexual abuse claims.[46]

In *State v. Doan*,[47] in contrast, the Court of Appeals held that the expert crossed the line when she testified that the victim's physical appearance and reactions while recounting the alleged abuse "'validat[ed]'" the victim's account of the abuse. The court said that testimony concerning the profile of a child abuse victim is admissible to explain certain behaviors and to rebut the implied or express defense assertion that the child is lying. "However, when the testimony goes beyond explaining the child's behavior . . . and asserts, directly or indirectly, that

[41] John E.B. Myers, Myers on Evidence of Interpersonal Violence: Child Maltreatment, Intimate Partner Violence, Rape, Stalking, and Elder Abuse § 6.21 (2012).

[42] *State v. Roenfeldt*, 241 Neb. 30, 486 N.W.2d 197 (1992).

[43] *Id*. at 39, 486 N.W.2d at 204.

[44] *Id*.

[45] *State v. Bruna*, 12 Neb. App. 798, 686 N.W.2d 590 (2004).

[46] *Id*.

[47] *State v. Doan*, 1 Neb. App. 484, 488, 498 N.W.2d 804, 807 (1993).

the child has in fact been abused or that the child is telling the truth, then many courts hold that such evidence goes too far."[48] The Court of Appeals concluded that in light of the current state of social science research and the case law, an expert has neither the legal authority nor the scientific qualifications to opine as to the truthfulness of the statement of another witness.[49] Therefore, "in a prosecution for sexual assault of a child, an expert witness may not give testimony which directly or indirectly expresses an opinion that the child is believable, that the child is credible, or that the witness' account has been validated."[50]

No one now disputes that Gobel's testimony impermissibly vouched for M.H.'s credibility. Nevertheless, it appears that in her exuberance or lack of familiarity with the relevant case law, the prosecutor believed Gobel's testimony was admissible because it explained the basis for M.H.'s PTSD. As the prosecutor had predicted in the hearing on the motion in limine, Gobel never *directly* testified that M.H. was telling the truth.

Importantly, the trial court agreed with the prosecutor's theory of admissibility. During the sidebar at trial, the court opined that asking Gobel what "event" led to M.H.'s PTSD was not improper vouching. It is difficult to conclude that the prosecutor intended to force a mistrial by invoking testimony that the court had expressly deemed admissible.[51]

We further note that after this testimony was adduced, the prosecutor expressed concern with avoiding trial error. The prosecutor was careful to clarify with the court what might be proper comment on this testimony during closing argument. The prosecutor said she would "make sure we don't say it wrong in the argument." Oral arguments were not transcribed,

---

[48] *Id.* at 490-91, 498 N.W.2d at 809.

[49] *Id.*

[50] *Id.* at 496, 498 N.W.2d at 812. See, also, *State v. Maggard*, 1 Neb. App. 529, 502 N.W.2d 493 (1993).

[51] See, e.g., *State v. Bostwick, supra* note 2.

but Muhannad does not argue that the prosecutor failed to carry out the court's directives. It appears from the record that the prosecutor throughout the trial attempted to avoid committing any errors. This, again, runs contrary to an intent to provoke a mistrial.

But even if we could somehow conclude that the prosecutor knew the question was improper and that the trial court was wrong in allowing it, it would not follow that the prosecutor was engaging in a plan to provoke a mistrial at Muhannad's behest. Besides the inherent illogic to such a plan of pursuing a mistrial based upon the admission of the very evidence the court repeatedly deemed admissible, other objective factors support the inference that the prosecutor did not intend to goad Muhannad into moving for a mistrial.

There was no pattern of misconduct during this trial. If this was prosecutorial misconduct, it was, at most, an isolated incident. The record does not reflect whether the prosecutor was surprised by the motion, but presumably so, since—again—the court had indicated at all times that the prosecutor was acting correctly. The prosecutor strongly resisted the motion for mistrial once it was made.

Finally, as the trial court indicated, the progression of the trial appeared to be in the State's favor and there would have been little to gain in provoking a mistrial. We find no clear error in this conclusion. Muhannad points out the lack of physical evidence and the various defense theories presented at trial, but he points to nothing atypical for a child sexual abuse prosecution. There is no indication that a second trial would go differently. As the trial court said, there would be no tactical advantage in provoking a mistrial.

In summary, the record supports the trial court's finding that the prosecutor did not intend to provoke a mistrial. This was not a "Machiavellian situation where the prosecutor deliberately courts a mistrial."[52] Indeed, defense counsel did not argue at the hearing on the plea in bar an actual intent to goad

---

[52] *Fields v. State, supra* note 24, 96 Md. App. at 744, 626 A.2d at 1048.

Muhannad into moving for a mistrial. He instead focused on gross negligence. And gross negligence is insufficient under the narrow exception set forth in *Oregon v. Kennedy*.

Because the prosecutor did not intend to goad Muhannad into moving for a mistrial, Muhannad maintained primary control over the course of events following Gobel's testimony. Muhannad chose to waive the right to have his trial completed by a particular tribunal, and his plea in bar was properly denied.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court denying the plea in bar.

AFFIRMED.

HEAVICAN, C.J., not participating in the decision.