Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/02/2021 09:07 AM CST

State of Nebraska, appellee, v.
Eric L. Ramos, appellant.

___ N.W.2d ___

Filed February 23, 2021.    No. A-19-948.

1. **Pleadings: Judgments: Appeal and Error.** Issues regarding the grant
   or denial of a plea in bar are questions of law; on a question of law, an
   appellate court reaches a conclusion independent of the court below.
2. **Motions for Mistrial: Pleadings: Prosecuting Attorneys: Intent:
   Appeal and Error.** While the denial of a plea in bar generally involves
   a question of law, an appellate court reviews under a clearly erroneous
   standard a finding concerning the presence or absence of prosecutorial
   intent to provoke the defendant into moving for a mistrial.
3. **Constitutional Law: Double Jeopardy.** The constitutional protection
   against double jeopardy does not mean that every time a defendant
   is put to trial before a competent tribunal, the defendant is entitled to
   go free if the trial fails to end in a final judgment. Balanced against a
   defendant's interests in having the trial completed in front of the first
   tribunal is society's right to one full and fair opportunity to prove the
   defendant's guilt.
4. **Double Jeopardy: Motions for Mistrial.** It is the general rule that
   where a court grants a mistrial upon a defendant's motion, the Double
   Jeopardy Clause does not bar a retrial.
5. **Double Jeopardy: Motions for Mistrial: Prosecuting Attorneys:
   Intent.** There is a narrow exception to the general rule permitting a
   retrial when a mistrial is granted on the defendant's motion, in that
   where a defendant moves for and is granted a mistrial based on prosecu-
   torial misconduct, double jeopardy bars retrial when the conduct giving
   rise to the successful motion for a mistrial was intended to provoke the
   defendant into moving for a mistrial.
6. **Double Jeopardy: Motions for Mistrial: Prosecuting Attorneys:
   Intent: Proof.** It is the defendant's burden to prove, in the Double
   Jeopardy context, that the prosecuting attorney engaged in misconduct
   intended to provoke a mistrial.

7. ____: ____: ____: ____: ____. Factors that a court may consider, in a Double Jeopardy context, in determining whether the prosecutor intended to provoke the defendant into moving for a mistrial include the following: (1) whether there was a sequence of overreaching or error prior to the errors resulting in the mistrial; (2) whether the prosecutor resisted the motion for mistrial; (3) whether the prosecutor testified, and the court below found, that there was no intent to cause a mistrial; (4) the timing of the error; (5) whether the record contains any indication that the prosecutor believed the defendant would be acquitted; (6) whether a second trial would be desirable for the government; and (7) whether the prosecutor proffered some plausible justification for his or her actions.

Appeal from the District Court for Johnson County: Vicky L. Johnson, Judge. Affirmed.

Jeffrey A. Gaertig, of Smith, Schafer, Davis & Gaertig, L.L.C., for appellant.

Douglas J. Peterson, Attorney General, and Stacy M. Foust for appellee.

Pirtle, Chief Judge, and Riedmann and Arterburn, Judges.

Arterburn, Judge.

## INTRODUCTION

Eric L. Ramos appeals the order of the district court for Johnson County, which denied his plea in bar following a mistrial. In denying the plea in bar filed after the mistrial, the district court determined that double jeopardy did not bar retrial, because the prosecutors did not intend to provoke Ramos into moving for the mistrial. We affirm the denial of Ramos' plea in bar.

## BACKGROUND

On October 19, 2017, the State filed an information charging Ramos with first degree murder, a Class I or IA felony; use of a weapon to commit a felony, a Class II felony; assault in the first degree, a Class II felony; use of a weapon to

commit a felony, a Class II felony; and tampering or destruction of evidence, a Class IV felony. In addition, the State alleged that Ramos was a habitual criminal. Subsequently, the State amended the information by dismissing the charges of assault in the first degree and the corresponding count of use of a weapon to commit a felony.

The charges alleged in the information stem from an incident which occurred at the Tecumseh State Correctional Institution (TSCI) on March 2, 2017. On that date, Ramos was an inmate lodged in TSCI's housing unit 2. Specifically, Ramos was housed in unit 2B and was assigned to cell 2B15. On March 2, when the inmates assigned to units 2A and 2B returned from lunch, they discovered that correctional officers had initiated a search of their cells, discovered a large quantity of homemade alcohol, and confiscated that alcohol. Some of the inmates in units 2A and 2B were observed using towels and clothing to cover their faces and were gathering in large groups. In addition, the inmates propped open the doors to the outdoor area (commonly referred to as the "2A/B miniyard") shared by units 2A and 2B, so as to give the inmates unfettered access to both units. The inmates ignored orders to return to their assigned cells, and correctional officers ultimately left the units in fear for their safety. Inmates in units 2A and 2B destroyed property in each of the units and set multiple fires. They also successfully covered a few of the cameras so that correctional officers could not see everything that was occurring in the units.

During this incident, Michael Galindo, an inmate who was housed in unit 2A, was repeatedly attacked by other inmates. Initially, he was assaulted in the 2A/B miniyard. He retreated to the common area of unit 2A in an attempt to escape his attackers. Four inmates followed Galindo into unit 2A and stabbed him over 100 times while he lay on the floor. One such inmate actually returned to Galindo after the other attackers had dispersed. This inmate again repeatedly stabbed Galindo. Once left alone, Galindo was able to get up and retreat to

cell 2A15, where he locked himself inside. Inmates located Galindo inside cell 2A15. One inmate retrieved a heavy piece of machinery from a broken icemaker. He broke the window in the door of cell 2A15 and threw a towel which was on fire into the cell. Galindo was later found deceased inside cell 2A15 by correctional officers. His cause of death was smoke inhalation that had been exacerbated by the numerous injuries incurred from the stabbing.

Based on its analysis of video evidence, the State maintained that Ramos participated in the initial stabbing of Galindo. Additionally, the State intended to identify Ramos as the inmate who returned to stab Galindo additional times and who broke the window in cell 2A15 and started a fire inside that cell. Ramos disputed the State's identification of him as a participant in the assault and murder of Galindo. Ramos refused to waive his right to a speedy trial. As such, trial was to begin in late July 2018.

*Discovery Issues*
*Prior to Trial.*

In January 2018, the district court ordered the State to provide "statutory discovery" to Ramos on or before February 21. The court later amended the discovery order to add that the State was to "make available to [Ramos] any and all evidence requested in the motion that is in the possession of the State; that . . . is material to [Ramos'] defense; and/or that the [S]tate intends to introduce as evidence during the trial." The court indicated that the State was granted reciprocal discovery, which was to be received at least 30 days prior to trial.

On February 21, 2018, the State filed a motion to extend discovery. In the motion, the State indicated that it had previously provided "significant discovery" to Ramos, but that the discovery in the case was "extremely voluminous." The State requested an additional 30 days to finish providing Ramos with discovery. In conjunction with the State's motion, it filed a certificate of discovery compliance, indicating that it had delivered discovery to Ramos' counsel on February 21. The

list of discovery items delivered to defense counsel spanned 4½ pages.

On March 8, 2018, a hearing was held on the State's motion to extend discovery. However, at the start of the hearing, the State informed the court that it had "the remainder of the discovery that we have prepared ready to give the defense today." The State subsequently filed a second certificate of compliance, indicating that it had delivered to defense counsel additional items of discovery consisting of more than 300 pages in reports, 126 pages of photographs, and over 100 audio files from TSCI inmate and staff interviews. The State also informed the court that its investigation was ongoing, "so there may be additional discoverable items that come into the State's possession." The State indicated it would supplement the discovery as needed. Ramos objected to the State supplementing discovery after the February 21 deadline. Defense counsel asserted that they could not properly defend Ramos without all of the relevant information and that the speedy trial clock was continuing to run. The State countered, asking the district court "to take into consideration the volume of material in this case when thinking about [defense counsel's] comments that we were doing anything in bad faith."

In responding to the parties' arguments regarding discovery, the district court made the following comments at the close of the March 8, 2018, hearing:

> Well, I think it's clear that there is a monstrous amount of information here, and it's a practical issue that we're all going to have to deal with.
>
> The murder happened in March 2017. Whether the State was precipitous in filing charges, I don't know, It's not my job to make that decision. But certainly when you file a murder case — and I am just looking at the district court's file for dates. The transcript was filed in September. Surely you had to know that you were going to start to have to gather information. And so I am not real happy about the fact that it took so long to get things moving.

I am glad that things are moving now, and right now
it's just a major headache for everybody. But we have got
— the clock is ticking. We have got masses of informa-
tion to resolve, and I will do my best.

On March 22, 2018, the State filed a document titled "Claim
of Informer Privilege." In the document, the State indicated
that it had provided some redacted discovery to Ramos, in
order to protect the names of inmate informants. The State
further explained:

[T]he State has complied with the Court's discovery order
to the extent we believe we're required to. In trying to be
transparent, we told the defense and the Court about this
other information. It's now before the Court. If the Court
decides that more of the information that we have should
be provided, then we are ready and willing to do that.

Ramos objected to the State's use of redacted discovery. The
district court expressed its frustration, telling the parties, "Okay.
Gamesmanship in this case is going to stop. It's on both sides."
As to the State's actions, the court indicated, "The State has
been dilatory in furnishing information in a case that it filed in
October. The State is — well . . . I can't begin to tell you how
much that complicates this case." Ultimately, the court decided
to examine an unredacted copy of the pertinent discovery to
determine whether Ramos was entitled to the information. The
court later ruled that the State must supply unredacted copies
of the pertinent discovery to Ramos and his counsel within
10 days.

On April 18, 2018, the State filed its third certificate of dis-
covery compliance, indicating that it had delivered to defense
counsel an additional 13 items of discovery, including various
reports and photographs. On May 3, the State filed its fourth
certificate of discovery compliance, indicating that it had deliv-
ered to defense counsel an additional 21 items of discovery.
Apparently, these items constituted the unredacted versions of
previous discovery provided to the defense, which the court
had ordered the State to supply.

Throughout the month of May, the State filed its fifth, sixth, and seventh certificates of discovery compliance. These certificates reflected that a total of 18 additional discovery items had been forwarded to defense counsel, including unredacted copies of previously redacted material. In June, the State filed its eighth certificate of discovery compliance, which indicated that it had supplied defense counsel with four additional items of discovery. Also in June, the State filed a motion to endorse an additional 68 witnesses for trial.

At a hearing on June 15, 2018, Ramos asked the court to not allow the State to endorse its additional witnesses. However, the court granted the State's motion. Ramos also asked that the court enter an order finding that any discovery turned over to the defense after the February 21 discovery deadline not be permitted as evidence at trial. The State explained to the court that it had

> provided almost all of the material the defense has on February 21st and March 8th, and that the information provided since March 8th is almost entirely related to ongoing investigation. . . .
>
> The information that [the continuing investigation] might discover could be helpful to the State; it could be helpful to the defense. In any event, we will promptly turn it over.

The court then stated:

> I realize everybody is in a bad position, but at some point . . . Ramos is going to have to make a choice. He's going to have to decide whether he's going to insist on his speedy trial rights, go to trial at the end of July with counsel who may or may not be prepared . . . or he can do like just about every defendant in the [S]tate of Nebraska facing a case this complex . . . waive his speedy trial rights and let his attorneys get ready.

In July 2018, the State filed its 9th and 10th certificates of discovery compliance, which indicated that it had supplied defense counsel with a total of 28 additional discovery

materials. Such materials included audio recordings of recent interviews with inmates, curriculum vitaes of the State's expert witnesses, and photographs of TSCI.

On August 3, 2018, which was 3 days before the State was to begin its presentation of evidence at trial, it filed its 11th and 12th certificates of discovery compliance. The certificates indicated that the State had forwarded to defense counsel recent photographs taken of Ramos, audio recordings of recent telephone calls made by Ramos, and audio recordings of recent interviews with a former TSCI inmate and the victim's sister. As a result of the filings of the 11th and 12th certificates of discovery compliance, defense counsel filed a motion to continue the trial. The court took counsel's motion under advisement, but ultimately overruled it, as the jury had already been empaneled. The court indicated that it would allow defense counsel time to depose witnesses associated with the recently filed certificates of discovery compliance.

*Trial.*

A jury was empaneled on August 2, 2018, after almost 4 days of voir dire. The parties gave their opening statements on August 6. In the State's opening, it informed the jury that it would not be presenting any forensic evidence or eyewitness testimony which directly implicated Ramos in Galindo's murder. Rather, the State's evidence would consist of video footage taken from the prison's camera system and from hand-held cameras utilized by prison staff during the March 2, 2017, incident. The State indicated that using the video footage, Tatiana De Los Santos, a corporal and a correctional intelligence officer, tracked one of the several individuals that was observed attacking Galindo. She was eventually able to identify that inmate as Ramos.

In their opening statement, defense counsel told the jury that Ramos was charged with Galindo's murder as a result of a careless and inept investigation performed by law enforcement. The defense pointed out that there was a great deal of missing

video that would not be shown to the jury. It also iterated that the State did not have any motive for Ramos to kill Galindo. Ultimately, it contended that the State had misidentified Ramos as being involved.

Prior to the testimony of any witness, the district court granted Ramos' motion to sequester the witnesses. The court informed both parties, "It will be the ongoing duty of counsel to advise their respective witnesses of the Court's rule of sequestration."

During the first 4 days of the State's case in chief, it presented the testimony of multiple witnesses who testified primarily about the physical makeup of TSCI; about generally what occurred in housing units 2A and 2B on March 2, 2017; and about the prison's video recording system. Notably, during these first 4 days of trial, the State did not offer any evidence to identify Ramos as the person who caused Galindo's death.

The State's last witness on the fourth day of trial was Christopher Connelly, who testified that he was a major and the current intelligence administrator for the Nebraska Department of Correctional Services. In that position, he was responsible for overseeing prison intelligence, including video and telephone surveillance. In March 2017, at the time of the incident which resulted in Galindo's death, Connelly was the investigative captain at TSCI. During his testimony, Connelly detailed the prison video recording system. Connelly then detailed his specific involvement on March 2.

At the end of the fourth day of trial, Connelly and the jury were watching an exhibit, which was video taken from a hand-held camcorder operated by a correctional officer in the prison's tower. The video demonstrated the view from the tower into the 2A/B miniyard during the events of March 2, 2017. Defense counsel had asked Connelly to watch the video and note the names of any of the inmates he was able to identify. Before the video had finished playing, the district court released the jury for the weekend. Trial was to resume the next Monday morning.

*Ramos' Motion
for Mistrial.*

Before trial resumed that Monday morning, counsel appeared before the court regarding a report that had been authored over the weekend by the lead investigator assigned to the case, Neal Trantham. In the report, Trantham indicated that he had worked with De Los Santos over the weekend and that they had recovered the missing video footage alluded to in defense counsel's opening statement. Trantham also noted in the report that, as a part of their efforts to find the missing video, Connelly had briefly attempted to assist them with a software issue.

Outside of the presence of the jury, defense counsel made three separate motions with regard to Trantham's report. First, the defense moved for a motion in limine to exclude from evidence the newly recovered video footage. Second, the defense moved to exclude the trial testimonies of Trantham, Connelly, and De Los Santos, due to a violation of the court's sequestration order. Finally, the defense moved for a mistrial. The defense argued that the State had clearly instructed two of its main witnesses, Trantham and De Los Santos, to perform further investigation during the trial. Trantham and De Los Santos then involved Connelly in this investigation. And, Connelly was in the middle of his trial testimony. The defense asserted that it was prejudiced by the actions of Trantham, Connelly, and De Los Santos in that its theory of the case had been compromised and Connelly's testimony had been tainted.

The State opposed the motion for a mistrial. It argued that the witnesses had not violated the sequestration order because that order only prohibited witnesses from hearing each other's trial testimonies. In addition, it asserted that it did nothing wrong by asking Trantham to conduct further investigation during the trial, because such investigation was an attempt to rebut defense counsel's claim that there were significant portions missing of the prison video. The State also asserted: "There is nothing prejudicial to [Ramos] that has occurred at this point. There is no irreparable harm. If the Court believes

that there is any type of prejudice, then that prejudice can be cured with measures far short of granting a mistrial."

After a recess, the district court granted the defense's motion for a mistrial and discharged the jury. Subsequently, the court scheduled a second trial to begin in January 2019 and accepted the parties' stipulation to change the venue for the second trial.

*Ramos' Plea in Bar.*

On November 2, 2018, almost 3 months after the court declared a mistrial, Ramos filed a plea in bar. Ramos alleged that his "motion for a mistrial was granted due to prosecutorial conduct which was intended to provoke or goad [him] into moving for a mistrial." As such, Ramos argued that retrial of the case was barred by the Double Jeopardy Clause.

An evidentiary hearing was held on the plea in bar on April 23, 2019. At the hearing, Ramos offered into evidence the record from the first trial. In addition, he called three witnesses to testify: Trantham, Connelly, and De Los Santos.

Trantham testified that he was the lead investigator assigned to the case involving Galindo's murder at TSCI. He recalled that sometime during the first week of the first trial, the prosecutors requested that he meet with De Los Santos again to try and recover the missing video alluded to during defense counsel's opening statement. Trantham explained that he was aware of what defense counsel said during his opening statement due to the news media coverage of the trial.

Ultimately, Trantham set up a meeting time between him and De Los Santos during the Friday of the first week of trial. During this meeting, Connelly came to assist them with the prison video software because he was more familiar with the system. Trantham indicated that the prosecutors did not specifically request him to meet with Connelly, but, rather, Connelly provided assistance only at the request of Trantham.

Trantham testified that when the prosecutors asked him to meet with De Los Santos regarding the missing video, they explicitly reminded him of the sequestration order and told

him not to talk about any trial testimony. Trantham admitted that during his meeting with De Los Santos and Connelly, they collectively discussed how defense counsel's opening statement was misleading because there was actually only 10 minutes of missing video. Trantham also admitted that during the meeting, Connelly expressed frustration with defense counsel's attempting to attack his character during his testimony. Trantham advised Connelly that they should not be discussing his testimony.

Upon questioning by the State, Trantham testified that the prosecutors never mentioned to him that they had concerns that the case would end in Ramos' being acquitted. In addition, they never advised Trantham of any "grave concerns" regarding the trial process.

Connelly testified that on the Friday of the first week of trial, he was at his office when he was asked by Trantham and De Los Santos to assist with installing the prison video software onto a computer. Connelly indicated that he installed the software, gave Trantham and De Los Santos his user name and password, and left the room. De Los Santos did not ask for his assistance in actually searching for the missing video. Connelly testified that he was aware of the sequestration order, but he did not believe that he was creating any issue when he was helping Trantham and De Los Santos. Connelly explained that when he left the courtroom without having finished his testimony, the prosecutors told him to "know no more on Monday when I came back than I did that night, not look at video, nothing." (We note that no trial proceedings were held on Friday.) Connelly believed that he abided by that restriction.

Connelly did admit that he mentioned to Trantham his frustration with defense counsel's attempting to bring up something from his past. However, Connelly explained that he did not think this was a problem because that fact was not relevant to the case.

De Los Santos testified that she had been trying, on her own, to find the missing portions of the prison video for "some

time." In the week or two prior to trial, her search became more urgent because she wanted the prosecutors to have all of the evidence. On the Friday following the first week of trial, she located the missing video on her hard drive, while Trantham was present.

De Los Santos indicated that she had been informed of the sequestration order by the prosecutors. Specifically, she had been told not to talk about the case with other witnesses. She denied having any contact with the prosecutors after the trial began.

After the evidentiary hearing, the district court entered an order overruling Ramos' plea in bar. In the order, the court made factual findings on each of the factors set forth in *State v. Muhannad*, 286 Neb. 567, 837 N.W.2d 792 (2013) (*Muhannad I*), paying particular attention to whether the State had engaged in a pattern of overreaching or error prior to the error which resulted in the mistrial. The district court ultimately concluded that Ramos had failed to sufficiently demonstrate that the State goaded or provoked him into moving for a mistrial. Ramos timely appealed.

## ASSIGNMENT OF ERROR

Ramos asserts the district court erred in overruling his plea in bar.

## STANDARD OF REVIEW

[1] Issues regarding the grant or denial of a plea in bar are questions of law. *State v. Arizola*, 295 Neb. 477, 890 N.W.2d 770 (2017), *disapproved on other grounds, State v. Melton*, 308 Neb. 159, 953 N.W.2d 246 (2021); *State v. Williams*, 24 Neb. App. 920, 901 N.W.2d 334 (2017). On a question of law, an appellate court reaches a conclusion independent of the court below. *Id*.

[2] While the denial of a plea in bar generally involves a question of law, we review under a clearly erroneous standard a finding concerning the presence or absence of prosecutorial intent to provoke the defendant into moving for a mistrial.

*State v. Muhannad*, 290 Neb. 59, 858 N.W.2d 598 (2015) (*Muhannad II*).

## ANALYSIS

The parties do not dispute the propriety of the mistrial. The issue presented in this appeal is whether concepts of double jeopardy bar a retrial and, thus, whether the district court should have granted Ramos' plea in bar.

Traditionally, the Double Jeopardy Clause has been viewed as safeguarding three interests of defendants: (1) the interest in being free from successive prosecutions, (2) the interest in the finality of judgments, and (3) the interest in having the trial completed in front of the first tribunal. *Muhannad I, supra*. This appeal involves the defendant's interest in having the trial completed in front of the first tribunal.

[3] The constitutional protection against double jeopardy does not mean that every time a defendant is put to trial before a competent tribunal, the defendant is entitled to go free if the trial fails to end in a final judgment. *Id*. Balanced against a defendant's interests in having the trial completed in front of the first tribunal is society's right to one full and fair opportunity to prove the defendant's guilt. *Id.* When society is deprived of its right to attempt to prove a defendant's guilt in a single prosecution because of a trial error, the interests of society in vindicating its laws generally outweigh the double jeopardy interests of the defendant. *Id*.

[4] It is the general rule that where a court grants a mistrial upon a defendant's motion, the Double Jeopardy Clause does not bar a retrial. *Muhannad I, supra*. A defendant's motion for a mistrial constitutes a deliberate election on his or her part to forgo the right to the trial completed before the first trier of fact. *Id*. This is true even if the defendant's motion is necessitated by prosecutorial or judicial error. *Id*. When the mistrial is declared at the defendant's behest, the defendant's right to have his or her trial completed by a particular tribunal is, as a general matter, subordinated to the public's interest in fair trials designed to end in just judgments. *Id*.

[5,6] There is a "'narrow exception'" to this general rule. *Muhannad II*, 290 Neb. at 65, 858 N.W.2d at 604. In *Oregon v. Kennedy*, 456 U.S. 667, 679, 102 S. Ct. 2083, 72 L. Ed. 2d 416 (1982), the U.S. Supreme Court held that where a defendant moves for and is granted a mistrial based on prosecutorial misconduct, double jeopardy bars retrial when the "conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." The Court in *Oregon v. Kennedy, supra*, rejected a "more generalized standard of bad faith conduct, harassment, or overreaching as an exception to the defendant's waiver of his or her right to a determination by the first tribunal." *Muhannad I*, 286 Neb. at 577, 837 N.W.2d at 800. Consequently, "[p]rosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on [the] defendant's motion, . . . does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." *Oregon v. Kennedy*, 456 U.S. at 675-76. The Nebraska Supreme Court has further explained the limited nature of the exception espoused in *Oregon v. Kennedy, supra*: "[I]n the absence of an intent to goad the defendant into moving for mistrial, double jeopardy would not bar retrial where the prosecutor 'simply made "an error in judgment"' or was grossly negligent." *Muhannad II*, 290 Neb. at 66, 858 N.W.2d at 604. It is the defendant's burden to prove this intent. *Muhannad II, supra*.

[7] In *Muhannad I, supra*, the Nebraska Supreme Court set forth a list of objective factors derived from and articulated by state and federal courts for consideration when determining whether prosecutors intended to provoke the defendant into moving for a mistrial. While not constituting a closed list, these factors include the following: (1) whether there was a sequence of overreaching or error prior to the errors resulting in the mistrial; (2) whether the prosecutor resisted the motion for mistrial; (3) whether the prosecutor testified, and the court below found, that there was no intent to cause a mistrial;

(4) the timing of the error; (5) whether the record contains any indication that the prosecutor believed the defendant would be acquitted; (6) whether a second trial would be desirable for the government; and (7) whether the prosecutor proffered some plausible justification for his or her actions. See *Muhannad I, supra*. See, also, *State v. Williams*, 24 Neb. App. 920, 901 N.W.2d 334 (2017).

The district court considered each of the factors delineated in *Muhannad I, supra*, in determining to overrule Ramos' plea in bar. Similarly, we consider each of the factors in turn.

*Sequence of Overreaching or Error.*

The crux of Ramos' assertion that the State intended to provoke him into moving for a mistrial is based upon his belief that the State engaged in a pattern of misconduct "up to, and during, the trial." Brief for appellant at 11. In Ramos' brief on appeal, he points to the State's "numerous discovery violations" as evidence that the proceedings below were "replete with instances of the State['s] provoking Ramos to move for a mistrial." *Id.* Ramos states:

> The State committed blatant and repeated discovery violations and obstruction of justice in contravention of Ramos' Sixth Amendment constitutional rights throughout these proceedings. The State's violation of the sequestration order in the middle of the trial was not an isolated incident; rather, it was the proverbial straw that broke the camel's back when reflecting upon the pattern or sequence of prior discovery violations by the prosecution . . . .

Brief for appellant at 10.

In the district court's order overruling Ramos' plea in bar, the court rejected Ramos' argument that the State engaged in a pattern of misconduct or error. Therein, the court explained:

> The Court also finds that the State was unprepared to release the massive amount of discovery material it had in a timely manner. The Court has never believed that the State did so maliciously; it simply was not ready

to proceed when the charges were filed. The State filed approximately ten Notices of Compliance, which continued until the time of trial. The Court finds that this failure was not done in an attempt to goad the defense into moving for a mistrial; it was poor planning at the front end, complicated by a massive flood of data on the tail end.

Upon our review, we do not find that the court committed clear error in determining that the State's actions in continually supplementing their discovery up to the time of trial were done with any intent to provoke a mistrial.

In Ramos' brief on appeal, he carefully recounts the numerous certificates of discovery compliance filed by the State from February to August 2018. He also details his multiple objections to the State's actions. However, Ramos does not point to any evidence which would suggest that the State was acting with an intent to provoke a mistrial during the discovery process. Rather, our reading of the record reveals, consistent with the district court's comments, that the State was not acting maliciously. While the State did appear somewhat unprepared to turn over all of its discovery in February, it did provide the defense with a large volume of information on February 21 and again on March 8. Moreover, as the State repeatedly explained, the investigation into the incident at TSCI on March 2, 2017, was ongoing, even as the parties prepared for trial. Because of this ongoing investigation, the State was receiving new information from law enforcement on a regular basis. It provided the defense with this information as soon as it became available. We further note that in comparison to the large volume of discovery forwarded to the defense on February 21, 2018, and on March 8, the discovery provided in April, May, June, July, and August consisted of much smaller packages of information.

Based on the totality of the foregoing factors, we find no evidence to support Ramos' generalized assertion that the State's failure to comply with the court's discovery deadline was done with any intent to provoke a mistrial. As such,

we find that this factor weighs against granting Ramos' plea in bar.

*Prosecutors' Resistance to*
*Motion for Mistrial.*

As the district court noted in its order, Ramos concedes that the State actively resisted the motion for mistrial. The record reflects that the State appeared to be surprised by the motion for mistrial. The State zealously argued that Ramos had not been prejudiced by the State's actions and that any issues created by Trantham's recent report could be appropriately handled by something much less harsh than the court's granting a mistrial. We conclude that this factor does not support a finding that the State intended to provoke Ramos into requesting a mistrial.

*Prosecutors' Intent to*
*Cause Mistrial.*

In its order, the district court noted that the prosecutors did not testify at the evidentiary hearing, nor were they called to testify by Ramos. The district court then found that there was no evidence presented at the hearing which would demonstrate that the prosecutors intended to cause a mistrial by instructing Trantham to look for the missing video footage. On appeal, Ramos argues that we should "negatively construe[]" the prosecutors' failure to testify regarding their intent. Brief for appellant at 17. Ramos explains, "The State's decision, whether strategical or for some other reason, to not offer any prosecutor testimony on this point should be negatively construed against the State and supports Ramos' position that Double Jeopardy has attached and bars a retrial." *Id*.

We decline to impute to the State an intent to cause a mistrial without any evidence of such intent. While it is true that the prosecutors did not testify at the evidentiary hearing, it is also true that Ramos had the burden to prove that the State provoked him to request a mistrial. See *Muhannad I, supra*. The State was under no burden to disprove the allegations

within Ramos' plea in bar. We agree with the district court that there was no evidence presented to demonstrate that the prosecutors intended to cause a mistrial by instructing Trantham to look for the missing video footage. Accordingly, we conclude that this factor also does not support a finding that the State intended to provoke Ramos into requesting a mistrial.

*Timing of Error.*

In Ramos' brief on appeal, he argues that the timing of the State's misconduct is indicative of its intent to provoke a mistrial. Specifically, he explains:

[The violation of the sequestration order] took place four days after the beginning of an expected two-to-three week trial, with the State still in the early stages of its case-in-chief. It is not like the State was close to the finish line or about to safely land the plane. The State had not yet put on any evidence establishing Ramos' guilt. Rather, it is plausible to infer that the State sought to hit the reset button and reshuffle the deck in order to be dealt a better and stronger hand.

Brief for appellant at 20. In the State's brief, it argues that the timing of the mistrial actually bolsters its argument that it did not intend to provoke a mistrial. The State points out that at the time of the mistrial, it had not presented any of its core evidence of Ramos' guilt. In particular, it had not presented any video recordings of the attacks on Galindo. The State then states, "It is illogical that the State would intend to cause a mistrial before presentation of its best evidence." Brief for appellee at 36.

In the district court's order overruling Ramos' plea in bar, the court found that the timing of the error weighed "slightly in favor" of Ramos' position. The court noted that "[t]he mistrial was granted primarily because it appeared that the witnesses had violated the sequestration order, because the late discovery of the 'missing video' came as a surprise to the defense, as well as the culmination of the series of errors [during the discovery process]." However, the court did not further explain how

the timing of the mistrial in any way demonstrated the State's intent to provoke Ramos' motion.

Upon our review, we find that the timing of the mistrial is ambiguous as to the State's intent to provoke a mistrial. Ramos asserts the timing was beneficial to the State because it was still in the beginning stages of its case in chief and a "reset" would not have resulted in much wasted time, but would have resulted in stronger evidence during a second trial. Brief for appellant at 20. However, the State argues the same timing weighs against the desirability of a mistrial. It questions why the State would have believed a mistrial was necessary when it had not yet begun to present the core of its case against Ramos. Given the ambiguity in this factor, we find that this factor does not weigh either in favor of or against granting Ramos' plea in bar. Therefore, to that extent, we find clear error in the district court's resolution of this factor.

*Prosecutors' Belief Regarding*
*Possible Acquittal.*

Again, we note that the prosecutors did not testify at the evidentiary hearing. As such, there is little evidence to demonstrate their belief about the possibility of an acquittal. Trantham did testify that as the lead investigator on the case, he had a great deal of contact with the prosecutors even after the trial started. He testified that the prosecutors never gave him the impression that they thought the trial would end with Ramos' being acquitted. In addition, the prosecutors did not discuss with Trantham any concerns about how the trial was going. We also note that at the time of the mistrial, the State had only just begun presenting its case to the jury. And, as we discussed above, most of the evidentiary rulings had gone in the State's favor. The State was not prohibited from introducing any of the evidence which was produced to Ramos after the original February 21, 2018, discovery deadline.

In the district court's order overruling Ramos' plea in bar, the court found, "What little evidence is in the record weighs

on the side of the prosecution being confident of a guilty verdict." We cannot say the court clearly erred in this finding.

### Desirability of Second
### Trial for State.

The district court found that what "little evidence" was presented regarding whether a second trial would benefit the State was in regard to the admissibility of the recovered video. The district court noted that during a subsequent trial, the defense would no longer be able to point to the missing video in support of its theory that law enforcement conducted a "shoddy investigation." Similar to the district court's statement, we do not find much, if any, evidence in the record regarding the desirability of a second trial for the State. The State's recovery of the missing video clearly negated a portion of Ramos' defense. However, prior to the mistrial's being granted, the State appeared to believe that the recovered video would be admitted into evidence as part of its rebuttal case. Given this belief by the State, a second trial would not be necessary to negate Ramos' defense. We conclude that this factor does not weigh in favor of granting the plea in bar.

### Plausible Justification for
### State's Actions.

The district court found that the State offered a plausible explanation for instructing Trantham to look with De Los Santos for the missing video footage. Specifically, the State indicated that it wanted to find the missing video to rebut the defense's theory that the rest of the video evidence was somehow unreliable because portions of that evidence had gone missing. We do not find clear error in the district court's finding. As such, this factor does not support a finding that the State intended to provoke Ramos into requesting a mistrial.

### Resolution of Muhannad I Factors.

Upon our review, the record supports the district court's conclusion as to all but one of the factors delineated in

*Muhannad I, supra*, and we find that factor to be neutral rather than slightly favoring Ramos' plea in bar. The record before us does not demonstrate a sequence of overreaching or error prior to the error resulting in the mistrial. There is no evidence that the prosecutors had an intention of causing a mistrial or that they believed the evidence was insufficient to sustain a conviction. And, the timing of the error resulting in the mistrial does not weigh for or against Ramos' position. Based on the totality of the evidence presented, we cannot find that the prosecutors intended to goad Ramos into moving for a mistrial. There is simply a lack of evidence in the record to demonstrate that the State intentionally committed prosecutorial misconduct or intended that such conduct would provoke a mistrial. Therefore, we find that the district court's determination was not clearly erroneous and that Ramos' plea in bar was properly denied.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court overruling Ramos' plea in bar.

Affirmed.